OF

# PENNSYLVANIA.

## Western District. September Term, 1810.

1810.

Pittsburg,
Friday,
September 7.

Lessee of JACKSON and others *against* BURNS.

A *British ante-natus* is incapable of taking lands by descent within the state of *Pennsylvania.*

3 B 75
215 395

THIS was an appeal from the judgment of the Circuit Court of *Allegheny* county.

It was an ejectment for a tract of land situated in that district of country formerly claimed by the state of *Virginia*, and afterwards ceded to *Pennsylvania* by agreement between the two states.

The lessors of the plaintiff claimed as heirs of *William Jackson* who commenced a settlement in the spring of the year 1774 upon the land in dispute, by clearing and fencing a part and planting corn in it, having previously, in partnership with *Hugh Sterling* who afterwards conveyed his share to *Jackson*, purchased the right of a certain *Sampson Beaver*. In the autumn of 1774 *William Jackson* went to *Ireland*, with an intention as he said to return the next spring and settle the land; but he did not return until the year 1784. He left it during his absence under the care of *Sterling* and *Beaver*, with a request that they would hire a person to keep possession, and carry on the improvement. In the spring of 1776 *Beaver* hired a man to maul rails. In the same year the defendant and a man of the name of *Deaver* came on the land. The defendant prevailed upon *Beaver* to give him up a bill

of sale from *Sterling* to *Jackson* which the latter had left in his possession, and a forged assignment was made upon it, by which the title was conveyed to the defendant. *Deaver* and the defendant appeared in opposition to each other before the *Virginia* commissioners, the defendant claiming the *whole* land under the bill of sale; but he was defeated by *Sterling*, who advocated the cause of *Jackson*, and told the commissioners that a forgery had been committed. The commissioners decided in favour of *Jackson*, and granted a certificate in his favour dated 8th *March* 1780, at which time he was in *Ireland*. A survey of 400 acres was made on this certificate on the 4th *January* 1786. *William Jackson* died a short time after his return to the *United States* in 1784. One of the lessors of the plaintiff, *John Jackson*, the elder brother and heir at law of *William, was born in* Ireland *before the American revolution, and was never in the* United States.

The defendant continued on the land from the time he first settled there in 1776, until the trial, and had made considerable improvements. On the 22d *April* 1785 he took out a warrant under *Pennsylvania*, on which he afterwards had a survey made. In *September* 1788 there was a hearing before the board of property between him and *Hugh Sterling*, the administrator of *William Jackson;* and the board decided in favour of the defendant, to whom a patent issued on the 6th *September* 1788.

From this evidence two questions arose: 1. Whether *William Jackson* derived a good title to the land, from his settlement, and the certificate of the *Virginia* commissioners. 2. If he did, could that title descend to his brother who was born before the revolution, and had never been in the *United States*.

The second question was reserved for consideration in bank. On the first the verdict was for the plaintiff, and a motion to set it aside, being overruled, the defendant appealed.

The cause was argued at *September* term 1807 by *Woods* for the plaintiff, and by *Ross* and *Addison* for the defendant.

On the *first* question the arguments for the defendant were as follows: By the law of *Virginia, William Jackson* acquired no right by any thing done before he went to *Ireland* in 1774;

the act of the 3d *May* 1779, *Revised Code* 90, being the first which recognised a title by improvement, and the decision in *Jones* v. *Williams* (a) being express, that *no right whatever* could be acquired in this way, in lands formerly belonging to the crown, until that act passed. This law, it is true, allowed to all persons who had *bonu fide* settled themselves and their families on waste and unappropriated lands before the 1st *Jan.* 1778, 400 acres for every family; but this was a bounty intended for *inhabitants* only, as appears by the 8th section, and not for absentees. But whatever right this law might have given to those who claimed the benefit of it before it was altered, a law to explain and amend it, which was passed the 4th *Oct.* 1779, *Revised Code* 113,introduced an absolute bar to *William Jackson's* claim, by directing that no certificate of right to lands for actual settlement, or of preemption right, should thereafter be granted by the commissioners, unless the person intitled thereto had taken the oath of fidelity to *Virginia,* or should take it before the commissioners; except in the case of the *inhabitants* of the territory in dispute with *Pennsylvania,* who should be intitled to a certificate upon taking the oath of fidelity to the *United States. Jackson* was not an inhabitant. He never resided on the land. He abandoned his improvement. He never took the oath of fidelity. He was in fact an alien. He elected to leave this country at the beginning of the war, and did not return until the end of it. He chose his side as he had a right to do. The defendant ran all the risk and hazard of the war, and is intitled to the reward of it. It is no objection to the defendant's title, that the commissioners of *Virginia* preferred *Jackson's.* They exceeded their authority, and their act was void. If *Jackson's* agent deceived them as to his situation, it was a fraud; if the commissioners knew the truth of his situation, they violated the law. In either case, the certificate and the survey under it were of no effect.

On the *reserved* point it was argued, that by the declaration of independence all the attributes of sovereignty were attached to the states, and all persons out of them became aliens. It was the creation of a government by common consent, to which all who were parties to the compact paid a vo-

1810.

Lessee of
JACKSON
v.
BURNS.

(a) 1 *Washington* 230

Lessee of
JACKSON
*v.*
BURNS.

luntary allegiance, but which neither claimed nor was intitled to allegiance from any one residing without the *United States.* Persons standing in this relation of alienage, have not, by either the law of nature or nations, a right to claim lands by devise or descent. Rights of this kind are wholly dependent upon the positive law of the country where the estate lies; 1 *Rutherford's Inst.* 109, 110. 118, 119; and in almost every quarter of the world, for the wisest reasons, aliens have been excluded from the enjoyment of them. There are then but two inquiries in relation to the asserted right of *John Jackson* under positive law. 1. Whether by the common law of *England,* which extends to this state, he is capable of taking by descent. 2. Whether any such right is secured to him by treaty between the *United States* and *Great Britain.*

1. The common law allows an alien to take by purchase, though he cannot hold; but it precludes him from taking by inheritance. *Co. Litt.* 2. *a. Calvin's Case* (*a*). 2 *Black. Comm.* 249. *Co. Litt.* 8. 1 *Woodeson* 374. He can take nothing by act of law, for want of inheritable blood; and it is wholly immaterial in what relation he stands to the individual who died seised. The son of an alien cannot inherit to his uncle who was a subject. *Collingwood* v. *Pace* (*b*). The son of an alien father and *English* mother, cannot inherit from his mother, if he was born out of the king's allegiance. *Doe* v. *Jones* (*c*). He is wholly cut off by the common law from all connexion with the soil of the country to which he is alien, except in a few instances, for the benefit of trade, or of the sovereign upon office found; and this common law is the law of this state, and the rule in the present case. 1 *St. Laws* 722, act of 28th *January* 1777. *Morris's Lessee* v. *Vanderen* (*d*). What then is an alien by the common law? A person born out of the allegiance of the king. In relation to our own government, a person born out of the allegiance of the *United States,* or considering the recent origin of this government, a person who never owed allegiance to the *United States.* Surely *John Jackson* stands in this situation. In order to intitle a person to inherit, he ought in reason to owe allegiance to the sovereign of the country where the inheritance lies, *at the time of*

(*a*) 7 *Rep.* 16.          (*c*) 4 *D.* & *E.* 300.
(*b*) 1 *Ventr.* 413.          (*d*) 1 *Dall.* 67.

*the descent.* The right flowing from the allegiance, they should be contemporaneous. But although this may not be required by the common law, yet it is at least essential that at some period the heir and the ancestor should have owed a common allegiance to that sovereign. The courts of *Great Britain* hold this to be sufficient, and upon this ground, it is said, allow *American antenati* to inherit lands in *England,* they having once owed allegiance to the king of *England.* Their courts however require this, and it is the least that can be required. There is otherwise no common tie between the heir and the ancestor. Now it is clear that *John Jackson* never owed allegiance to the *United States,* and therefore it is the same case, as though he were a native of *France.* The whole argument for the right of *John Jackson,* is founded upon a *dictum* of the judges in *Calvin's Case (a),* that although the kingdoms of *Scotland* and *England* should thereafter by descent be divided and governed by several kings, yet all those born under one natural obedience while the realms were united under one sovereign, should remain natural born subjects, and not aliens. If this means natural born subjects of the *British* crown, it does not affect the present case, because it applies merely to *American antenati;* if it means natural born subjects of the future *Scottish* crown, then it is to be remarked that it is extrajudicial, unreasonable, and almost absurd, because it makes a man a natural born subject of a government, that was not in existence at his birth, nor perhaps for a long time afterwards. This *dictum* it is presumed is the foundation of the only respectable opinion against us, that of Judge *Tucker* in his edition of *Blackstone.* 2 *Tuck. Black. App.* 53, 54. 61, 62.

2. There is no treaty between *Great Britain* and the *United States,* which gives this right to *John Jackson.* The 6th article of the treaty of 1783, merely provided that there should be no future confiscations made, nor prosecution commenced against any person by reason of the part he had taken in the war; and that no person should on that account, suffer any future loss or damage in person, liberty, or property. The object obviously was to guard against future penalties and

_____

(a) 7 *Reb.* 27 *b.*

1810.

Lessee of
JACKSON
*v.*
BURNS.

forfeitures; but it has nothing to do with escheats for want of inheritable blood. The losses in contemplation were of property actually possessed; otherwise a man might say he had *lost*, because he was not allowed to make future *purchases* of land. The 9th article in the treaty of 1794 stipulates that " *British* subjects, *then* holding lands in the territories of the " *United States*, should continue to hold them according to " the nature and tenure of their respective estates and titles, " and might grant, sell or devise the same to whom they " pleased, in like manner as if they were natives; and that " neither they nor their heirs or assigns should, so far as might " respect the said lands and the legal remedies incident " thereto, be regarded as aliens." This has no bearing upon the case of property held in 1784, and escheated at that time, on account of the alienage of the heir.

The arguments for the plaintiff were on the *first* question, that the state of *Pennsylvania*, by confirming the agreement between the commissioners of this state and *Virginia* relative to the disputed territory, had agreed that in the decision of disputes, preference should be given to the elder or prior right, whichever of the states it might have been acquired under. 2 *St. Laws*, 208. It was therefore in the first place a question of priority, which the evidence most conclusively settled in favour of *William Jackson*. To defeat the title thus superior in date to the defendant's, various objections had been urged. It was said he had abandoned his improvement. This was a question of fact, which the jury could not have decided, upon the evidence, in any other manner than they did. He left agents to prosecute and defend his settlement. It was said he became an alien. This also was in some measure a question of fact. He went before the war upon a temporary visit, which was prolonged by the breaking out of the war; and he returned as soon as the state of the two countries would permit him. It was said that an improvement before 1779 could give no right. But the act of 3d *May* 1779 is directly opposed to this doctrine, since it recognises settlement and improvement prior to 1778; and all that is decided by the case of *Jones* v. *Williams* is, that until the passing of that act, no right could be acquired by improvement prior to 1779.

*William Jackson* continued an inhabitant up to the time the certificate was granted; and although he did not take the oath of fidelity, yet it is to be observed that the act of 3d *May* 1779 under which his rights vested, did not require it, and no subsequent law could defeat them by altering the conditions upon which they were to be enjoyed. The certificate of the commissioners of *Virginia* must have been founded upon this distinction. There is no evidence that it was obtained by deception, though the defendant certainly endeavoured to oppose it by a forgery; and under such circumstances, their certificate has always been considered evidence of title.

On the *reserved* point it was contended that the common law gave, and the treaties between the *United States* and *Great Britain* confirmed, the right of *John Jackson.*

1. By the common law. When *William Jackson's* right first accrued, the inhabitants of the *United States* and of *Great Britain* were subjects of one sovereign. *John Jackson* at that time could have inherited real estate left by his brother in the colonies, or in other words, he then possessed inheritable blood which intitled him to take his brother's estate in the colonies by descent. They were born under a common allegiance, which gave to them reciprocally this capacity of inheritance; and the question is in what manner has one of them lost it, while it is agreed, the other would have retained it to this day, had he lived. The inquiry at common law always is, whether the party was *alien born;* for by that law it is the condition of allegiance in which he is placed at his birth, that decides his capacity to inherit. Now it is clear that *John Jackson* was not alien born. Then how has he lost his inheritable blood? The same law destroys this quality only for the commission of certain crimes, which cannot be imputed to *John Jackson.* It follows that the inheritable blood remains. The judges in *Calvin's Case* (a), throughout their argument, refer to the state of things at the time of the party's birth, as fixing his character. " The time of his " birth is of the essence of a subject born; for he cannot be a " subject of the king of *England,* unless at the time of his

(a) 7 *Rep.* 18 *b.*

1810.

Lessee of
Jackson
v.
Burns.

"birth he was under the legiance and obedience of the king. "And that is the reason that *antenati* in *Scotland* (for that at "the time of their birth they were under the legiance of ano- "ther king) are aliens born in respect of the time of their "birth;" and then the report proceeds to state why such an alien born cannot inherit lands in *England*, notwithstanding the subsequent allegiance which the *antenati* owed to the *British* crown. The common bond of allegiance at the birth makes the inheritable blood. "Whosoever are born under one "natural legiance are natural born subjects." "Whosoever at "his birth cannot be an alien to the king of *England*, cannot "be an alien to any of his subjects of *England*." (25 *a.*) And "for as the *antenati* remain aliens as to the crown of *England*, "because they were born when there were several kings of "the several kingdoms, and the uniting of the kingdoms by "descent subsequent, cannot make him a subject to that "crown to which he was alien at the time of his birth, so "albeit the kingdoms *should by descent be divided and gov-* "*erned by several kings*, yet it was resolved that all those that "were born under one natural obedience, while the realms "were united under one sovereign, should remain natural "born subjects and no aliens." (27 *b.*) This is precisely the present case; and it is upon this principle that *American antenati* inherit lands in *England*. This doctrine, it is to be observed, is delivered as the resolution of the judges, and not as the *dictum* of one or a few, or the argument of counsel; and it is remarkable, as Lord *Coke* says in the concluding page of his report, that the case was decided without any discordance of opinion, the lord chancellor and twelve judges concurring. It has also been adopted by a respectable judge in our own country, who considers the principle to have been laid down by *Bracton*, and merely recognised in *Calvin's Case*, 2 *Tucker's Black. App.* 54.

2. By treaty. The same respectable judge holds, "that "the common law principle, that the *antenati* of both coun- "tries were natural born to both, and as such capable of hold- "ing or inheriting in both, was revived by the definitive treaty "of peace, as it was evidently the intention of the parties to "restore all individuals to the same condition they were in

" before the war, as far as existing circumstances would per-
" mit, notwithstanding any part which they might have taken
" either actually or *constructively* in the war." 2 *Tuck. Black.
App.* 62. The treaty stipulated that no person should suffer
on account of his part in the war, any loss in property; and
considering that but for the circumstance of *John Jackson's*
constructive agency in the war as a *British* subject, his inhe-
ritable blood would have remained, and he would have en-
joyed the property in question, he may be said to lose it, if
the objection prevails. It seems also by the treaty of 1794,
that the right of *British antenati* to inherit, was taken for
granted, because the 9th article stipulates generally for the
succession of all the heirs, whether born before or after the
peace, of such *British* subjects as then held property in the
*United States;* that is, it goes so far as to provide for the claim
even of *postnati* to the inheritance of such *British* subjects.

*Cur. adv. vult.*

On this day, the judges delivered their opinions.

TILGHMAN C. J. This is an appeal from the Circuit Court
of *Allegheny* county. A verdict was found for the plaintiffs;
the defendant moved for a new trial, and his motion was over-
ruled.

Two questions were made on the argument. 1st, Whether
*William Jackson* deceased, who died in the state of *Pennsyl-
vania* about the year 1784, without issue, and intestate, had
good title to the land in controversy? 2d, Supposing that
he had title, whether *John Jackson* one of the plaintiffs, the
elder brother of *William,* who was born in *Ireland* before the
*American* revolution, and was never in any part of the *United
States* is capable of inheriting as the heir of *William?* My
opinion will be confined to the second question.

The plaintiff's counsel endeavoured to support the verdict
on two principles. 1st, That by the common law, *John Jack-
son* was capable of taking by descent. 2d, That by the trea-
ties between the *United States* and *Great Britain* in the year
1783 and 1794, the right of taking by descent was secured
to him, even though it was not given by the common law.
On the second point it is unnecessary for me to enter into an

argument, because the law has been lately settled by the Supreme Court of the *United States* in the case of *Dawson's Lessee* v. *Godfrey*. 4 *Cranch* 321. It was decided that *Mrs. Dawson*, the lessor of the plaintiff, who was born in *England* before the year 1775, always remained a *British* subject, and was never in the *United States*, was to be considered as an alien, and incapable of taking by descent from her brother *Russel Lee*, a citizen of the *United States*. So far as regards the construction of treaties, the judgment of the Supreme Court is an authority by which this court is bound; because by the constitution and laws of the *United States*, the Supreme Court is, in such cases, the court of appeal in the last resort. But with respect to the principles of the common law, the opinion of that court is not binding. To say that it is, would be a voluntary, and unwarrantable surrender of the independence of the state courts. It remains then to be considered, whether by the common law as adopted in this state, *John Jackson* is an alien, incapable of taking land by descent.

By the declaration of independence (4th *July* 1776) all political connexion between *Great Britain* and the *United States* was dissolved. From that day the state of *Pennsylvania* became completely sovereign and independent; and the people of *Great Britain* and *Pennsylvania* had no other relation to each other than that of aliens; in war enemies, in peace friends. It has never been denied that this was the case so far as respected sovereignty and allegiance. But it has been contended, that by the principles of the common law prevailing in both countries, certain rights flowing from former connexion remained in the people of each; that the right of inheritance was unimpaired, in all those who were born before the dismemberment of the *British* empire, because the people of both countries were once bound in allegiance to the same sovereign. Considering this subject on the principle of reason, abstracted from authority, it would seem that the right of taking by descent, should be governed by the condition of the party at the time of the *descent cast;* because it is *then* that he is to enjoy the inheritance. The denial to aliens of the right of taking land by descent, must have been founded on political motives; on the danger of giving too much influence to persons, who so far from having

a common interest with the people of the country, may have an interest directly opposed to them. Now this danger is not lessened, by the circumstance of the people of two countries having been once bound in bonds of common allegiance. I suspect, if the principle contended for, could be traced to its source, it would be found to have originated in another principle, not compatible with the constitution of *Pennsylvania*, or her sister states; that is to say, that no man can, even for the most pressing reasons, divest himself of the allegiance under which he was born. This doctrine is founded chiefly upon *Calvin's* case. To the main point decided in that case, there can be no objection; it was simply this, that *Calvin* who was born in *Scotland*, *after* the crowns of *Scotland* and *England* were united in the person of *James* the first, was not to be considered as an alien in England. But the judges, in the course of their arguments, laid down many other principles, which being collateral to the point in question, were in some measure extrajudicial; and it is certain, that they have not all been received with approbation by their successors. I am informed however, and believe it to be a fact, that by the law as *now* held in *England*, citizens of the *United States*, born before the revolution, are capable of taking lands in *England* by descent. It is supposed by some, that merely for that reason, the courts of the *United States* should extend the same principle to the subjects of *Great Britain*. To this I cannot assent. I confess I should be mortified, if my own country was surpassed by any on the globe, in acts of humanity and benevolence. But it is evident, that courts of justice have no right to regulate these matters. They are for the sovereign power of the nation. The judges must decide according to the law. The *English* adhere to their principle, that those who were born under the king's allegiance, can never be considered so completely aliens, as to be incapacitated from taking land by descent. But I apprehend, that they restrict the right of inheritance to the case of persons either *born* under the king's allegiance, or being under it at the time of the descent cast. I presume they do not extend it to all those, who have owed a temporary allegiance; for instance, to the inhabitants of a country conquered in war, and ceded by the treaty of peace, to its former sovereign. This principle then, even if sound, cannot be applied to the circumstances of the

1810.

Lessee of
JACKSON
*v.*
BURNS.

*United States;* because although there was a time when the people of *England* and the *United States* owed allegiance to the same sovereign, yet there never was a time when the people of *England* owed allegiance to the *United States.* I have said, that the judgments of the Supreme Court of the *United States* are not binding on us, except in cases where an appeal lies to that court. But they are intitled to very great respect, and consideration; certainly to much more, than the judgments of any court in *England* since the revolution. Now the very point before us, has been expressly decided by the Supreme Court in the case of *Dawson's Lessee* v. *Godfrey* which I have mentioned. It would have been more agreeable to me, if this cause could have been decided without my opinion; because, having argued the same point at the bar of the Supreme Court in the case of *M'Ilvaine* v. *Coxe,* it is possible that my mind may have retained some of the impressions it received in preparing for that argument. But upon reflection, I have concluded, that it would be more satisfactory to the country to know the opinions of all the judges in a case of so much importance. Having considered it attentively, since the argument in this court, my opinion is, that *John Jackson,* not now owing allegiance, and never having owed allegiance, to the *United States,* is in all respects an alien, and as such incapable of taking land by descent. I am therefore for a new trial.

YEATES J. The plaintiff obtained a verdict in this cause on a trial at a Circuit Court held for the county of *Allegheny,* subject to the court's opinion on a reserved point, whether *John Jackson* could take by descent as elder brother and heir at law of *William Jackson?*

The Circuit Court gave no opinion on the question, considering it as a matter of national moment. The counsel by mutual consent have argued the case before the whole court in bank.

The claim of *William Jackson* rested on a *Virginia* entry made in his behalf on the 18th *March* 1780, for 400 acres on *Montour's* run, and a subsequent survey made thereon upon the 12th *January* 1786. He went to *Ireland* in 1774, and returned from thence in the spring of 1784. He died intestate

prior to the act of assembly passed 19th *April* 1794, 3 *St.* *Laws* 521; and the question to be determined is, whether the lessor of the plaintiff, who was never in the *United States*, as his elder brother, could intitle himself as his heir.

It has been contended on the part of the plaintiff, that *British* subjects born previous to the treaty of peace, concluded on between the *United States* and *Great Britain* on the 3d *September* 1783, might well inherit lands in *America* after the separation of the two countries; and that the two brothers, being subjects of the same sovereign before the declaration of independence, could hold under each other by descent; that their rights were only suspended during the war, but were revived by the peace.

The court felt the importance of the subject in a national view, and considered uniformity of decision in a case of this nature in the tribunals of the different states, as a peculiar *desideratum*. They well knew that the question had been fully argued in the Supreme Court of the union, and that it must necessarily receive a decision in the *dernier resort*. We have not been disappointed in our expectations. The opinion of the Supreme Court of the *United States* delivered by *Johnson*, Justice, 4 *Cra.* 322, in *Dawson's Lessee* v. *Godfrey*, settles the point reserved in this case, if its authority is admitted. It is there laid down that the correct decision of the *English* law is, that the right to inherit depends upon the existing state of allegiance, *at the time of the descent cast.* The *antenati* of *America* may continue to inherit in *Great Britain* because we once owed allegiance to that crown. But the same reason does not extend to the *antenati* of *Great Britain*, because they never owed allegiance to our government. It would be a contradiction in terms, to assert, that one owes allegiance to a government, which did not exist at the time of his birth. I forbear to detail further the argument adduced in support of the opinion delivered; and I shall only add that I perfectly concur therein.

The judgment of this court cannot be rendered on the verdict in favour of the plaintiff, but a nonsuit should be entered; or if the plaintiff's counsel desires it, a new trial may be awarded without costs.

1810.

Lessee of
JACKSON
*v.*
BURNS.

1810.          BRACKENRIDGE J. having been of counsel in the cause
Lessee of    while at the bar, declined giving an opinion.
JACKSON
v.                                    New trial awarded.
BURNS.