By the Court, Nelson, Ch. J.
Joseph Orser, senior, and his family, who joined the British forces in 1782, and never afterwards returned to reside in this country—thus electing to continue their allegiance to the British government after the *81 severance by the declaration of independence—are to be regarded as aliens, according to the settled doctrine of this country ; (Jackson v. White, 20 Johns. R. 313 ; Inglis v. The Trustees of The Sailor’s Snug Harbor, 3 Peters, 99 ;) and the question in the case is, whether the plaintiffs, as such aliens, can make title to the premises in dispute. It is admitted that Joseph, the son of John, who adhered to the country, is entitled to recover the one-fifth.
It was decided in Kelly v. Harrison, (2 John. Cas. 29,) and in Jackson v. Lunn, (3 id. 109,) that the division of an empire worked no forfeiture of previously vested rights of property ; and consequently, that the titles of British subjects to lands in the United States, acquired prior to the revolution, remained unimpaired. The principle was directly applied in both these cases ; thus enabling aliens to hold lands in this state, after the separation, in all cases where the title had been acquired before that period. In the case of Jackson v. Limn, the doctrine was carried still further; for Mrs. Gage, (the wife of Gen. Gage,) was allowed to recover upon the strength of a title by descent that accrued on the death of her mother in the autumn of 1776—after the dismemberment, and when this country had thrown off her allegiance and established an independent government—both mother and daughter being at the time non-resident British subjects. This result was supposed to follow, as a legal consequence, from the admitted general principle that preserved unimpaired the right and title of the mother ; for if, as was said, the issue then alive, and born and living in England, were, by the revolution, rendered incapable of taking the land by inheritance, the revolution did, in fact, impair one of the most valuable ingredients of the title. It destroyed her then existing inheritable blood, and imposed on her the necessity of selling the land to an American citizen, in order to save it from escheating at her death. The case was deemed, therefore, to constitute an exception to the general rule that aliens cannot take by operation of law.
The principle upon which Mrs. Gage was permitted to re *82 cover in Jackson v. Lunn, would undoubtedly embrace the alien children and descendants of Joseph Orser, senior. They stand precisely in her position. The title of the ancestor to the premises in question was acquired before the revolution. He continued to adhere to the mother country, and died an alien in 1783. If Mrs. Gage had capacity to take on the death of her mother in the autumn of 1776, the children of Joseph Orser, senior, also had, at the period of his death in 1783. But the further and more full discussion of this doctrine in the courts of the United States and elsewhere, as to the operation and effect of the revolution upon the rights and condition, personal and political, of the citizens and subjects of the respective countries at the period of dismemberment, has resulted in showing conclusively that the alien heir cannot inherit, as the common law disability applies in all its force. And, accordingly, the distinction upon which the exception to the general rule was sought to be sustained in Jackson v. Lunn has been repeatedly repudiated as unfounded in law or reason.
In the case of Dawson's Lessee v. Godfrey, (4 Cranch, 321,) it was directly held, that a subject of Great Britain, born before the revolution, could not inherit lands in the state of Maryland, where the common law, as in this state, prevailed— that according to the invariable doctrine of that law, the right to inherit depends upon the existing state of allegiance at the time of descent cast, and not upon a community of allegiance at the time of the birth; and that the ante nati of Great Britain formed no exception to the general rule. And in the case of lnglis v. The Trustees of The Sailor's Snug Harbor, (3 Peters, 121,) it was declared to be the settled law of the country, that a person born here, who left the country before the declaration of independence, and never returned, became thereby an alien, and incapable of subsequently taking lands by descent. (See also Fairfax's Devisee v. Hunter's Lessee, 7 Cranch, 603 ; Orr v. Hodgson, 4 Wheat. 453 ; Blight's Lessee v. Rochester, 7 id. 535 ; Jackson's Lessee v. Burns, 3 Binn. 75.) The same doctrine is equally applicable, where the person born here adhered *83 to the old government, and left the country after the declaration of independence. “ Prima facie,” says Mr. Justice Thompson, in Inglis v. The Trustees of The Sailor’s Snug Harbor, (3 Peters, 121,) “ and as a general rule, the character in which the American ante nati are to be considered, will depend upon, and be determined by, the situation of the party and the election made at the date of the declaration of independence, according to our rule • or the treaty of peace, according to the British rule. But this general rule must necessarily be controlled by special circumstances attending particular cases, and if the right of election is at all admitted, it must be determined, in most . cases) by what took place during the struggle, and between the declaration of independence and the treaty of peace.” After examining the doctrine of the English courts, which hold that the American ante nati did not lose their character of British subjects unless they remained after the treaty of peace, he adds : “ Our doctrine is, that by withdrawing from this country, and adhering to the British government, they lost, or, perhaps more properly speaking, never acquired the character, of American citizens.” It was accordingly one of the propositions decided in that case, that if the grand assise should find that Charles Inglis the father, (a resident of the city of New-York at the declaration of independence,) and his son John, the demandant, did, in point of fact, elect to 'become and continue British subjects, and not American citizens, the demand-ant was an alien, and disabled from taking real estate by inheritance. (Id. p. 190.) The case of Orr v. Hodgson, (4 Wheat. 453,) is perhaps more directly to the purpose in several points of view. Mrs. Paradise was seised of a moiety of an estate in Virginia on the death of her father in 1767, with whom she was residing at the time in England. She was married to a British subject in 1769, by whom she had a daughter, Lucy, born in England in 1770, and who afterwards married a Venetian subject. Lucy died in Venice, leaving two sons. Mrs. P.’s husband died in England in 1796. In 1805 she returned to Virginia, and died in possession of the premises in *84 1814—leaving no issue but the two grand-sons in Venice. The defendants, two nieces of Mrs. P., would have been heirs at law, if no such issue had been living. It was argued in this case, that though Mrs. P. was born in Virginia, yet having removed with her father to England before the revolution, and.remained there until long after, she must be regarded as having elected to remain a British subject; and, if an alien, then the estate held by her could not pass by descent, but, for defect of inheritable blood, must escheat to the government. This view of the case was admitted, had it stood upon the doctrine of the common law ; but it was held, that the sixth article of the treaty of peace of 1783, between the United States and Great Britain, completely protected the estate from escheat and enabled Mrs. P. to transmit the same by descent. The casé was also regarded as coming within the protection of the ninth article of the treaty of 1794, by the express terms of which the estate might lawfully pass to the heirs. It was further held, that the treaty of 1794 did not include any other persons than such as were British subjects or American citizens ; that therefore it did not embrace the two grand-children, who were aliens to both governments; and consequently, upon general principles of law governing the inheritance of real property, the estate in question passed to the next of kin, the two nieces. For, where a person dies, leaving issue who are aliens, the latter are not deemed his heirs in law. They have no inheritable blood, and the estate descends to the next of kin who have inheritable blood, in the same manner as if no such alien issue were in existence. (Id. p. 510 ; Jackson v. Green, 7 Wend. 333 ; Jackson v. Fitz Simmons, 10 id. 9.)
It being clear then, that the alien children of Joseph Orser, senior, were incapable, upon common law principles, of taking the premises in question by descent at the time of his death, by reason of alienage, the only question remaining is, whether the plaintiffs have brought their case within the protection of the definitive treaty of peace of 1783, or the subsequent treaty of 1794.
*85 It has been frequently decided that these treaties only provide for titles existing at the time they were entered into between the two governments, and not for titles subsequently acquired. The parties claiming lands under either of them must show title in themselves or their ancestors at the very time the treaty was made. (Harden v. Fisher, 1 Wheat. 300 ; Orr v. Hodgson, 4 id. 453 ; Blight’s Lessee v. Rochester, 7 id. 535.) They were designed to operate upon then existing rights, but do not give title. In this case, John Orser, senior, the ancestor, died in the summer of 1783, at which time the estate must have descended, if at all, to the alien children, and the definitive treaty was not signed till September following. The ancestor being thus an ¿lien at the time of his death, and no treaty having intervened to save the estate, the inheritance was regulated by the rules of the common law, which, we have seen, cast it upon the heir capable of taking the same, as if there had been no other issue in existence. Consequently, John, who remained and adhered to this country through the revolution, took the whole estate, and on his death it descended to his children.
New trial denied.