9 w 183
133  455
9 w 183
189  346

## Hoffman *against* Strohecker.

Upon the trial of an issue involving the validity of a sheriff's sale, it is competent to give in evidence all the purchaser said or did, which was calculated to prevent persons from bidding.

If it appear upon the trial of a cause, that a person offered as a witness, was equally interested in the subject-matter of the action with the defendant, at the time of its commencement, he can not, by a subsequent release of his interest, discharge himself from liability for costs, and thus make himself a competent witness.

The purchaser of a fraudulent title, must be able to show clearly, that he is a

*bona fide* purchaser without notice, and has paid the purchase-money, of which the receipt of the vendor will not be sufficient.

ERROR to the common pleas of *Berks* county.

This was an action of ejectment for fifty-one acres of land adjoining the town of Reading, in which Jacob Hoffman was plaintiff and Peter Strohecker was defendant. The cause was once before in this court, and there is a very full statement of the facts in the former report of it, in 7 *Watts* 86. The evidence which gave rise to any other question now determined is sufficiently stated in the opinion of the court.

*Hoffman* and *Greenough* for plaintiff in error.
*Smith* and *Mallory* for defendant in error.

The opinion of the Court was delivered by

HUSTON, J.—This cause was in this court before, and is reported in 7 *Watts* 86. The statement of facts there set out is substantially those in this case; but much evidence was produced on this trial, which either was not known, or at all events not adduced there. In some particulars also, the testimony was more full; it seems to have been proved, that at the time the sale of the second tract to Seidel was set aside, it was with a wish that Strohecker should become the purchaser: that in order to have it sold again, Strohecker came into court and offered to give 500 dollars more than Seidel's bid. At that time we may suppose the *alias venditioni exponas* for the residue was awarded. This offer by Strohecker is proved by Sietsinger; and he also proves, that it was. mentioned that by a sale on this execution, which was for a debt due by his father, Garber would get clear of the recognizance given to the heirs, of whom Susan Deem was one, when the land was awarded to him by the orphans' court. It would also seem, that, after the debt was paid on the 14th of April, 1823, and satisfaction entered on the judgment, and also satisfaction entered on the same day on a judgment against John Strohecker, for the same debt, John Strohecker went along with Garber and the sheriff, to induce Mr. Heister to issue the *alias venditioni exponas*, under the allegation that it was to save costs, and expedite the settlement of the estate. It appears the families of Garber and Strohecker were connected by intermarriage, and no wonder that Mr. Heister was, in such circumstances, and on such application, induced to give a præcipe for the execution, on the third of June 1823, though satisfied in full on the 14th of April previous.

The first bill of exceptions was decided before. The evidence mentioned in the second could not be rejected, when the bond for the purchase-money by Peter, was offered by him, cancelled. Though what weight it would have, might depend much on what would appear in the progress of the cause.

[Hoffman v. Strohecker.]

The fourth bill of exceptions seems of no consequence. The case of Ellmaker and Buckley, in 16 *Serg. & Rawle,* seems to be called on at this time to produce more effect than is intended. That case decided, that when a witness is called to prove a particular fact, and has proved it, it would be irregular, under color of a cross-examination, for the defendant to ask him as to other matters, and thus bring out the whole of his own case before plaintiff had concluded his testimony or defendant's counsel opened his defence. It never was intended to prevent the opposite party from asking the witness a question relating to what he had just testified, or closely connected with it.

The fifth and sixth bills of exceptions will be considered together. Gen. Keim was called as a witness, and testified that he went to the sale, and Strohecker met him before he got to the house, and asked him what he intended to do.—"I replied," says he, "that I had said I would give 6000 dollars for the property, and I came on that account. Strohecker said he wanted it; appeared anxious about it; I then left; do not recollect what it fetched; he said more which he did not recollect distinctly;" he added, "I went to the sale for the purpose of bidding, did not wish to be deficient from what I said before." Plaintiff asked him, what was the reason you did not bid at that sale? Objected to, overruled and exception; plaintiff then asked, was you prevented from bidding by any thing said to you by John Strohecker or not? Again excepted to, overruled and exception. We have been at a loss for the reasons why these questions ought not to have been answered. They both had the same meaning—were both intended to ascertain whether some more had not passed between him and Strohecker, than he had mentioned. We have had several cases in which the conduct of a purchaser has been impeached, and in each of them, all that such purchaser said or did, calculated to prevent bidders, has been proved, and the cause has turned on it. The witness ought to have been directed to answer the questions so far as they had any connection with John Strohecker; and if he was not prevented from bidding by any thing connected with or said by John Strohecker, he could have said so. Although the first question may be construed so as to ask for the private motives of the witness for his conduct, yet the obvious intention, considering what was in dispute, and what he had stated, was to elicit more particularly what had passed between him and John Strohecker as to that sale. The second question was pointedly to this same purpose, and the answer ought to have been required.

The seventh bill of exceptions and the ninth, were waived. The eighth related to testimony to prove that Peter, the defendant, had paid money to counsel in 1832 and 1834, due from his father in a suit or suits which commenced in 1827 and in 1834, the first of which related to the right to the property in question. It is not easy to decide, when testimony is offered in a case like this, what

[Hoffman v. Strohecker.]

may be evidence of payment of the consideration money. The bond given by Peter, and now produced by him cancelled, may have been discharged by direct payments to his father, or by paying debts due, or which thereafter became due, and it did not then appear whether it was part of the original agreement that the bond was to be discharged by such payments or not; nor is it very clear whether these payments were or were not made with money which, by the agreement hereafter to be mentioned, they were to receive on debts due John Strohecker.

The tenth bill relates to the admission of William Feather as a witness. I will endeavour to state this matter so that it may be understood.

A notice and proceeding had taken place in a previous stage of the cause, as follows:

" Jacob Hoffman being duly sworn, doth depose and say, that an article of agreement was drawn by Adolph Hartzfield, between William Feather and the defendant in this case, some time in the year 1828, by which, according to the testimony on the trial of the cause before arbitrators, it was provided, that, if any or the whole of the property of either the said William Feather or the defendant, which they had received from John Strohecker, including the property in dispute in this action, should be taken from them or either of them, the loss thereby sustained should be equally borne by them, the said William Feather and Peter Strohecker. That in the opinion of this deponent the said article of agreement is in the possession or power of the said defendant, and is pertinent evidence in the issue of this cause. And that notice has been given to the defendant to produce the same upon the trial before the arbitrators and in court without effect, or the non-production thereof accounted for in any manner.                  J. Hoffman.

" Sworn and subscribed, January 14, 1839, in open court."

" January 16, 1839. The court order the defendant to produce the paper within set forth on the trial of the above cause, to wit: on the 25th February, A. D. 1839, or that judgment will be given against him by default, in accordance with the provisions of the act of assembly passed February 27, 1798, entitled, ' An act extending the powers of the judges of the supreme court and common pleas.' "

" Peter Strohecker being duly sworn according to law, doth depose and say, that Adolph Hartzfield never did draw an article of agreement between him and William Feather, containing a provision, that if the property in dispute in this action should be taken from him and William Feather, or either of them, that the loss thereby sustained should be equally borne by them, or containing any provision about the property in dispute being taken from him and William Feather, or any of them; that no such agreement was ever executed by this deponent, nor is any such article of agreement in the possession or power of this deponent.

            " Peter Strohecker.

[Hoffman v. Strohecker.]

" Sworn and subscribed, this 25th day of February, A. D. 1839, in open court."

The preceding affidavit of Mr. Hoffman and order of the court being read, the affidavit of Peter Strohecker, the defendant, was read, and then the plaintiff called and examined Hartzfield, who proved that he wrote, and Feather and Strohecker executed, an agreement, sometime in 1828, and as he thought, in January of that year he went with William Feather to John Strohecker's, for the purpose of making family arrangements. That Peter lived there or was there—that several deeds were lying on the table—that the old man gave several deeds to Feather—that a deed to Peter was lying on the table—that he saw it in the handwriting of Judge Richards (who had before proved that he wrote it). After stating something which occurred in detail, he said—then a conversation was entered into between Peter Strohecker and William Feather, and Feather allowed Peter had more than he had. They then agreed to share alike. I then drew up a duplicate article between Feather and Peter; the contents of that paper was that they would stand alike; if it turned out in the end that one had more than the other, that then they should be made alike.

After some testimony as to some notes in bank, and that the old man's name should be taken off the notes, and that witness endorsed a note, &c. &c., witness was cross-examined, and said—I understand they got the property of John Strohecker as a gift—they were to stand equal. He repeats that this was in January or February, but that Feather and Peter did not execute the agreement between them at that time, but afterwards, in William Feather's house. That it was drawn according to instructions, and read to the parties before it was executed.

In the course of his cross-examination, the article was shown to the witness, who recognized it, and his name to it as a witness. After his examination closed, it was read, and is as follows:

" Articles of agreement made and concluded this 21st of April, 1828, between Peter Strohecker, of Cumru township, and William Feather, of Windsor township, both in Berks county, witnesseth, Whereas the said Peter Strohecker has purchased of John Strohecker, his father, real property conveyed to him by the said John Strohecker and Juliannah his wife, by their deed or deeds dated ——— ———, at the sum of five thousand five hundred dollars, as in and by the said deed more fully appears; and whereas the said William Feather has also bought of the said John Strohecker real property conveyed to him by same, by deed or deeds dated ——— ———, at the sum of two thousand five hundred dollars, as in and by the said deeds more fully appears; and whereas the moneys paid and the debts by the said parties assumed to pay, are and were an equal concern between them, the said Peter Strohecker and William Feather, and they hold the said separately conveyed property jointly, so that the property conveyed to Peter Strohecker in fee, is still

[Hoffman v. Strohecker.]

*bona fide* to one moiety, or equal undivided half part the property of Wiliam Feather in fee, and so *vice versa* the property conveyed to William Feather in fee, is still to one moiety or equal undivided half part, the property of Peter Strohecker in fee.   And whereas it is agreed by and between the said parties, that the debts so by them assumed to be paid, if paid out of the proper means of the said John Strohecker, shall be to their joint benefit, although it may go in the name of any of them, therefore the parties to these presents have agreed, and hereby do agree as follows:—That, for the purpose of retaining jointly the property conveyed to Peter Strohecker, the property conveyed to William Feather as aforesaid, shall be sold for the payment of the debts of the joint concern, and go to the credit of both the contending (contracting) parties.   And whereas the said parties hold jointly property in Northumberland county, on which it is likely a law suit may arise, it is also hereby agreed, that the risk, trouble, and expense shall be borne *jointly*, so that all and every item of the said transactions shall be, and actually are, of mutual joint and equal concern: provided, nevertheless, that none of the parties shall be responsible for a larger sum than for what the properties respectively and severally shall have been sold to him, and the consideration mentioned in the deeds, only all losses and deficiencies in sale shall be equally borne; and provided also, that the accounts in these concerns, and the several interests in and to the same, or of either of the said parties, shall be finally settled, after all the debts assumed by them are paid, at or immediately after the decease of both the said John Strohecker and Juliannah his wife, and not before.   In witness whereof, the parties to these presents have hereunto set their hands and seals."

There was other evidence, not necessary to be noticed, given before and after William Feather was offered as a witness; mutual releases were executed between Feather and Peter in March previous to the trial, but he was still objected to, admitted, and exception taken.  Although he stated something not mentioned by Hartzfield, and their testimony was in some things contradictory, yet he agreed that the article above given was executed by him and Peter, and did not allege that it was not drawn according to their agreement.  As the principal stress of the cause lay on the admission of Feather as a witness, and the construction and effect of this article of agreement, I shall consider them in part together.  Catherine Garber and Hartzfield would prove that the agreement was made at John Strohecker's, and in his presence, though executed afterwards at Hamburg.  Feather says Peter and he spoke about the agreement at the old man's, but did not conclude it until Peter came to Hamburg.  But it appears old John Strohecker knew what was doing, and that Feather and Peter were to pay his debts, or assume them.

These facts proved, as related to the previous understanding of all parties, and the situation in which they stood, what does the

agreement itself prove? It is very explicit—that Peter and Feather are to hold the property conveyed to them respectively, jointly, so that the property conveyed to Peter in fee is still *bona fide* as to one moiety or equal undivided half part the property of William Feather; and so the property conveyed to William Feather in fee, is *bona fide*, as to one moiety or equal half part, the property of Peter Strohecker. It then agrees that if the debts assumed are paid out of the proper means of John Strohecker, it shall be for the benefit of the joint concern, no matter through which of their hands it goes; and that the property of Feather shall be sold to pay the debts of the joint concern, and go to the benefit of both contracting parties; and this for the purpose of retaining the property conveyed to Peter; and that the expenses shall be borne equally, so that every item of said transaction shall be, and actually is, of mutual, joint, and equal concern. Now this makes Feather equally interested with Peter in the tract in question, and equally liable for all costs; he is clearly interested, and in the language of the court, whether his name appears on the record or not is immaterial. 3 *Penn. Rep.* 177.

But further, in Smith *v.* Boyer, 3 *Watts* 449, it is decided that a landlord who receives, or is to receive, the rents, is liable for mesne profits, though his name is not on the record. Though in one respect his differs from what it would be if on the record; he may controvert the right—but all who aid in a trespass are trespassers, and equally liable to damages for the trespass—and Feather, who is equal owner, or was so till the releases, cannot by any arrangement between him and Peter cut himself loose from his liability both to costs and mesne profits; and this will be strengthened if it be satisfactorily made out that he took an active part in the defence. Certainly before the releases he was bound to pay, or if Peter paid, to allow for his half of all expenses; and there is some evidence that he summoned at least one witness to attend the trial. There was error in admitting him as a witness. John Strohecker was not a party to the article above recited, though there is parol evidence that he knew of it, perhaps present when the terms of it were settled, but suppose he was. The sale to John Strohecker seems unquestionably neither legal nor fair; and, supposing it invalid, the whole stress of the cause has been put on the question whether his to Peter was a fair *bona fide* transaction—a sale to an innocent purchaser for a fair consideration, which has been fully paid before notice of any defect or unfairness in the title of John Strohecker. The doctrine that an innocent purchaser might be protected, though buying from a person whose title was fraudulent and void, is found in our books from Lazarus *v.* Bryson, 3 *Bin.* 84, down to this time. There are some cases as to what must appear to make a *bona fide* purchase, and to evidence it in Hale *v.* Rogers, 4 *Watts* 359, 362, it is stated that a receipt from the vendor is not sufficient evidence of payment of the consideration,

as against a creditor charging a fraud; and it is said to be unreasonable to impose on the creditor proof of a negative: the man who alleges payment of considerations must prove it; and in United States *v.* Marto, 2 *Watts* 406, it is said, "A bargain by which the purchaser may get the estate at an undervalue, by the happening of a contingency is clearly within the statute. An estate worth 8000 dollars might be bought for a fourth of that sum, if a purchaser of it for 2000 dollars, but subject to incumbrances to the amount of the remaining 6000 dollars, could procure the incumbrancer to take satisfaction out of the debtor's other property. In order to insure fair dealing it is necessary that the purchaser should be bound to pay the worth of the property in any event, either directly to the vendor, or in discharge of liens; not merely to pay a sum less than the value in the first instance, and take his chance for the residue. The counsel pray a direction that as the vendee did not pay the encumbrances, the conveyance was fraudulent on that account. The court thought it enough to rebut the inference of fraud, that they were paid out of the land. The objection lies deeper than seems to have occurred to the court or the counsel. The validity of the conveyance depends not on supplementary acts, but on the character of the conveyance when executed."

These cases apply to many parts of this cause; it might be right to read the cancelled bond, which is no more than a receipt, and to prove payments for John Strohecker in 1832 or 1834, but these without more will not suffice to prove a *bona fide* purchase or payment of consideration. Peter Strohecker could not be a *bona fide* purchaser without knowing it. What did he and Feather state that they did know; why that conveyances had been made to them separately amounting to about 8000 dollars; that they had assumed to pay some debts for the old man; that they expected to pay part of these out of the proper means of John Strohecker; that, to say nothing of the Northumberland property, they expected to pay all the debts out of what was conveyed to Feather, and save the property conveyed to Peter for their joint use; now it is impossible to read this without seeing that both Feather and Peter considered it a family arrangement intended to give them the tract conveyed to Peter for 5500 dollars, and for which they did not expect to pay a dollar.

The keeping back the article until its existence and contents had been proved by the testimony of witnesses by parol, was not in the ordinary course of proceeding in court, and I feel convinced that the respectable gentlemen engaged for Peter now see that it ought to have been produced in the first instance on the notice. There was some difference between the witnesses on some matters but little connected with the point in issue. They both proved that after talking about it, at the old man's, it was drawn and executed by both Feather and Peter and there was no allegation that it did not contain what they agreed on and intended it should contain. If

there had been different statements of its contents by witnesses, yet when produced and read it made an end of all parol proof of its contents.    It spoke for itself and plainly, and it proved that the deed and bond did not represent the sale by John to Peter, as Peter and Feather understood it, and as they intended and accepted it.

When we recur to the facts, that this land was bound by a recognizance to Susan Deem for her share of her father's land: that the part allotted to her had been swept away by an old mortgage: that the administrators of her father's estate had settled an account by which they acknowledged a large balance in their hands: that John Strohecker was their bail in their administration bond: that suit had been brought against him on this bond: and when we see that he had joined in proving a sale of this property on a judgment satisfied, and so to his knowledge: that after bidding in the property he paid no money on it for nearly four years, nor then, but two years after bidding it in brought a suit against the administrators who had joined him in procuring this illegal sale and obtained a judgment against Garber's estate which was set off against his purchase-money: and when we remember that this sale to John Strohecker was contrived to overreach the recognizance to Susan Deem, it throws a cloud over the whole business so as to require clear proof that the sale to Peter was not what the articles between him and Feather prove they understood it to be; *i. e.* a plan to give it to Peter apparently for 5500 dollars cash paid, when in fact Peter and Feather knew that no such money was paid or expected or intended to be paid.    Admitting that S. Deem told John Strohecker he wished him to purchase, this goes for nothing if he thought the sale was to be fair.    If he knew it was not fair but fraudulent and intended to deprive his wife of her share of her father's estate, it will not injure her; even a fraudulent and voluntary sale of her interest would not affect her right to recover; and this is proved and admitted to be by her trustee and for her use.

Judgment reversed, and a *venire de novo* awarded.