## JONES v. PORTSMOUTH AND CONCORD RAILROAD, HAVEN, VENNARD AND HATCH.

If an officer, by direction of the creditor, take any measures which are calculated to prevent competition at the sale of property taken on execution, and the purchaser assents, the sale will be set aside as fraudulent.

Where a railroad corporation, on settlement with a contractor, agreed to pay him a certain sum in shares, or bonds of the road, at his election, the amount, however, to be retained by them as indemnity against certain liabilities to which the road was subject, and they made out and delivered to the contractor a certificate of so many shares, with an agreement indorsed to exchange them for bonds, at his election, and these certificates were then returned to the railroad as such indemnity — *held*, that the corporation was bound to deliver the bonds according to their agreement, notwithstanding the treasurer of the road had entered the shares on their records as the property of the contractor, and they had in consequence been sold on execution as his property.

IN EQUITY. The material facts which appear on the bill, answers, exhibits and proofs, are as follows :

Belknap, Hale and Jones were contractors for work on the Portsmouth and Concord Railroad, and had large claims upon the corporation. Before any settlement, Belknap died, and Hale and Jones, as surviving partners, afterwards made a settlement with the corporation, and the railroad paid and settled the balance found due to the firm, partly in cash, in part by a transfer of shares to them, and in part by an agreement relative to certain other shares in the road, which were accepted in discharge of the debt. Of the shares, two hundred and thirty-four were issued without qualification, but as to others there was a special contract between the contractors and the corporation. The views of the parties differ as to the nature of the bargain, but there are writings relating to the shares, and the contract respecting them, from which we may form a just idea of the true agreement.

In the statement of the accounts at the settlement, we find the following charge against Hale and Jones :

" *March* 27, 1850. To agreement for bonds when issued, $6,823.14."

The railroad company gave to Hale and Jones a written agreement, as follows :

" Received of Hale and Jones, surviving partners of Belknap, Hale and Jones, a firm heretofore engaged in building the Concord and Portsmouth Railroad, a certificate for $6,800, in stock of said railroad, and a receipt for $23,14, convertible into bonds, when issued and desired, and also notes of said railroad of this date to us, and of the following sums : two of $1000 each, and two of $250, payable in eighteen months, to be held as collateral security, to indemnify the said railroad against any and all trustee processes now pending in any county in this State, wherein said Hale and Jones, as said surviving partners, are defendants, and said railroad are summoned as trustees, and the same may be disposed of to the best advantage by said railroad, to pay any execution which may be issued against said railroad, as trustees for them, as soon after the issue of the same as they may find it convenient, and for the interest of all concerned, and so to do, unless paid by said Hale and Jones.

Dated at Portsmouth, March 27, 1850.

Portsmouth and Concord Railroad, by

ANDREW B. VENNARD, *Treasurer.*"

A certificate was issued and delivered to Hale and Jones for sixty-eight shares of the stock of the railroad, upon the back of which was written a memorandum, as follows :

" It is hereby agreed that the within stock may be converted into bonds, when issued by said railroad, if desired by said Hale and Jones.

March 27, 1850.

Portsmouth and Concord Railroad, by

ANDREW B. VENNARD, *Treasurer.*"

This writing, the answer alleges, was the agreement and all the agreement made between said parties in relation to said $6,823.14, and the said sixty-eight shares of stock stood upon the books of said corporation in the names of said Hale and Jones, without any limitation or condition whatever, at the time of the seizure and sale on execution after mentioned.

At the February term, 1850, of the Court of Common Pleas for Rockingham County, J. H. Price, survivor of Hall and Price, recovered an execution against Hale and Jones for $6,519.86, debt and costs, which was delivered to a deputy sheriff to be levied on three hundred and forty-six shares of the Portsmouth and Concord Railroad, then appearing to be standing in the names of Hale and Jones, and the officer levied on two hundred and seventy-eight shares as the property of Hale and Jones, both, or either of them, and upon all the right, title and interest which the said Hale and Jones, both, or either of them, had in and to any shares in said railroad, and any and all interest which the said Hale and Jones, both, or either of them, had in said road, and proper notices were given of a sale, June 4, 1850.

Before the sale, fifty-five shares were sold by Jones, by the assent of the creditor, Price, and given up, the proceeds being applied on the execution.

On the 4th of June one hundred and fifty shares were sold by the sheriff, and about fifty others were struck off. The sale was then adjourned, as to all the stock and interest of Hale and Jones, both, or either of them, in said corporation, not then sold, to June 14, 1850.

After this adjournment, Jones, to whom Hale upon a settlement between them had assigned all his interest in the property of the firm, including their choses in action, gave a notice in writing to the president of the railroad, as follows :

" *To the President and Directors of the Concord Railroad :*

You are hereby notified that upon the 21st day of April, 1850, the surviving partners of the former firm of Belknap, Hale and Jones were in possession of and owned one hundred and thirty-seven shares, and no more, in the Portsmouth and Concord Railroad Corporation, and have never owned or possessed any additional shares in said road since that date, having transferred for full value, *bona fide,* all other shares of which they were once owners.        HALE & JONES, by

June 4, 1850.                        A. H. JONES."

At the commencement of the adjourned sale this notice was read by the officer, by direction of Mr. Hatch, the attorney of Price, the creditor, and the statement made that two bidders at the former sale had withdrawn their bids, but that the creditor, Price, and Mr. Hatch, believed the notice to be false, and that Hale and Jones owned a large number of shares. It was also stated that " because, by reason of said false and fraudulent notice, it was impossible for the said officer, or Hatch, to know or declare accurately how many shares in the stock of said railroad were owned by said Hale and Jones, or either of them, at the time of the said seizure upon said execution," and the officer, by Hatch's request, having announced that he had sold one hundred and fifty of their said shares upon said execution, and that there stood upon the books of said corporation in the names of said Hale and Jones, at the time of said seizure, three hundred and forty-six shares of said stock, (of which fifty-five had been released,) offered for sale, to the highest bidder, *all the remaining right, title and interest which the said Hale and Jones, both, or either of them, had, at the time of said seizure, in and to all shares or stock in said corporation;* and the said shares, right, title and interest were struck off to said Hatch, as the highest bidder, for seventy-one dollars, Jones alone having bid against him. The officer then offered for sale, and sold to the said Hatch as highest bidder, all the remaining interest the said Hale and Jones, both, or either of them, had on the 30th day of April, 1850, not before sold.

Return was made by the officer of a copy of the execution, and the officer's return of sale to the clerk of the railroad, and his fees paid him for recording the same, and on the 18th of June, 1851, the corporation, at said Hatch's request, issued to him a certificate for eighty-six shares, being the same sold by the officer, and which, on the 25th of May, 1850, stood upon the records of the corporation in the name of Hale and Jones, and so unclaimed by any other person, more than a year, till said transfer ; the certificate of sixty-eight of said shares having during all that time been holden by said railroad, as a

548 ROCKINGHAM.

pledge and collateral security, as before stated, against certain trustee suits, which are alleged to be all settled before said seizure and sale, and none are pending at the date of the answers, and no execution has issued or can issue against the railroad in them.

At the date of the pledge of these shares the railroad were not authorized to issue bonds, but both parties contemplated they would be, and on the 13th of July, 1850, an act passed giving that authority. A demand for the bonds instead of shares was made in November, 1850, when the act had been accepted, but none before the sale.

Eighteen shares were, at the time of the attachment and sale, standing in the name of the defendant, Vennard, to whom they had been assigned by Jones in trust for J. S. Jenness, and they were ordered by him to be reässigned to Mr. Jones, upon a settlement after the sale was made upon the execution, but the certificates were made out and delivered to Mr. Hatch.

*J. Bell* and *W. H. Y. Hackett*, for complainant.

The complainant contends that it appears from the answers and evidence —

I. That on the 27th of March, 1850, he held, in addition to his other stock in the Portsmouth and Concord Railroad, sixty-eight shares, which were by contract convertible into the bonds of the road.

II. There has been no valid sale of this stock and contract to Mr. Hatch, or to any other purchaser. The pretended sale on execution cannot be sustained:

1. Because it was an attempt to sell without description or designation of the shares sold. In sales of personal property on execution, the property, if of a visible kind, must be present, and if not, must be designated by some certain description. See *Smith* v. *Fritt*, 1 D. & B. 241 ; 2 U. S. Dig. 333 ; *Warring* v. *Loomis*, 4 Barb. 484 ; *Hazzard* v. *Burton*, 4 Har. 62 ; 2 U. S. Dig. 333 ; *Lowry* v. *Colter*, 9 Barr 349 ; 9 U. S. Dig. 220 ; *Gift* v. *Anderson*, 5 Humph. 547 ; 4 U. S. D. 768 ; *McNeeley*

v. *Hart,* 8 Ired. 492 ; 11 U. S. D. 218 ; *Blount* v. *Mitchell,* 1 Tayl. N. C. 131 ; 4 U. S. D. 773 ; *Bank* v. *Evans,* 10 S. & M. 55 ; 8 U. S. D. 177 ; *Nesbitt* v. *Dallam,* 7 G. & J. 494 ; 4 U. S. D. 772 ; *Day* v. *Graham,* 1 Gilm. 435 ; 4 U. S. D. 772.

The complainant had two hundred and seventy-eight shares or more, of which the sixty-eight in controversy were pledged to the railroad. The bidders at the sale could not have known either the number held by the debtor, or how many of them were incumbered by the pledge.

2. The right of the complainant in the sixty-eight shares after they were pledged to the road, was not the subject of a sale on execution. It was a right of redemption in the shares, and a contract for their conversion into bonds. If it had been liable to such a sale, it should have been sold by its description, indicating its true character. *Sewall* v. *Lancaster Bank,* 17 S. & R. 385.

3. The sale is void as to Mr. Hatch, who bought with notice of all the facts, because it was made for a small proportion of the actual value ; in fact for a mere trifle. The sixty-eight shares, without reference to their additional value, because they were convertible into bonds, were worth over $2000 at the rate at which the other stock was sold; eighty-six shares of which Mr. Hatch claims that the sixty-eight were a part, were sold to him for seventy-one dollars.

Such sales have often been set aside or treated as void. *Bixby* v. *Mead,* 18 Wend. 611 ; *Nesbitt* v. *Dallam,* before cited ; *Enloe* v. *Miles,* 12 S. & M. 147 ; 9 U. S. D. 219 ; *Higgins* v. *Kenrick,* 2 Shep. 83.

III. The corporation, having disposed of their bonds, should be decreed, after a reässignment of this stock to them by Mr. Hatch, to purchase or issue bonds, and pay the interest which has accrued, or to make the complainants a pecuniary recompense. *David* v. *Bank of England,* 2 Bligh 393 ; Angell on Corp. 363, 436, 457, and cases cited.

*Hatch* and *Emery,* for the defendants.

The defendants reply—I. That all the statements of the answers are supported by the evidence, and the allegations of the bill are completely contradicted or avoided by the answers and proof.

II. The agreement between Jones and the railroad, that he might convert sixty-eight of a large number of shares that he held, into bonds, did not alter the character of any of his stock, or exempt it from ordinary attachment.

III. The sales to Mr. Hatch and the other purchasers were valid. They were in due form of law, with notice to Jones, and in his presence, and without fraud or objection from him. The property was designated as certainly as was possible. A certain number of shares were standing in Jones' name. That fact was proclaimed at the sale. Jones, falsely and fraudulently, and with intent to defraud a creditor, denied that he owned them. The fact was proclaimed, with the further fact that the creditor and Mr. Hatch did not believe his denial. No other course remained but to sell all his rights, whatever they were. If there was any indefiniteness in the sale, Jones caused it. If he has suffered, it is by his own falsehood and fraud.

2. The sixty-eight shares were not in fact subject to any pledge. They were not sold subject to any such incumbrance ; and if they were in fact pledged, it is for the purchaser and not for Jones to complain. The seller of mortgaged property cannot avoid his deed, because he has represented and warranted the title to be clear.

The sale to Mr. Hatch was without fraud on his part. He knew no fact which was not known to Jones, and to a large company present at the sale. The bill indeed charges fraud, but in a manner so repugnant that the charge defeats itself. The answers negative all fraud, and no proof tending to show any unfairness is offered. Jones did attempt to screen his property from sale on execution, by what the bill itself shows to be falsehood and fraud. He digged a pit and is fallen into it. He deterred others from bidding, and shall not now be heard to say that the sale was for an inadequate price.

To set aside the sale for inadequacy of price would be to complete the fraud which Jones attempted. He undertook to conceal and save the property from lawful sale on execution. By falsehood he deterred others from bidding. He compelled Mr. Hatch as attorney for an absent creditor, to bid or lose his debt. He did bid as attorney only in behalf of his client. He bid in defiance of the falsehood Jones had promulgated, and incurred the risk of losing his money if Jones' statement should prove true. Jones commenced the bid at four pence half penny, and declared that was all his rights were worth. How much was Mr. Hatch bound to bid.

The return on the execution shows that the whole debt was not satisfied by a large sum of money, except by a levy on real estate, which did not produce satisfaction by a large sum. If Jones had permitted the property to have been sold fairly, the debt would have been paid. Restore the stock, &c., to Jones, and he escapes payment of a large amount of his debt, because a compromise and release of the judgment was made on a partial payment after this sale, in consideration of the difficulty of collecting any thing of a fraudulent debtor, and the uncertainty of a levy on real estate.

Jones should not have come into court without offering at least to pay the balance of Price's debt and interest, to refund the money paid by Hatch, and to pay all costs. He who asks equity should do equity. In fact, the stock is now utterly worthless, and the Portsmouth and Concord Railroad is utterly insolvent, and unable to pay or to furnish bonds.

IV. The complainant has shown no case which requires or justifies the interposition of a court of equity. If he has any remedies, they are at law.

BELL, J. The principle we think is clear, that the officer who would make a sale of personal property of a debtor on execution, must have it so far in his possession and control, that he can designate and exhibit the articles of property which he proposes to sell, where they are of a visible character ; and on similar rea-

sons, where the property does not admit of actual possession, the officer must obtain such knowledge of the state of the property that he may be able to describe to the purchasers, precisely and definitely, the property he offers for sale.

In the case of *Warring* v. *Loomis*, 4 Barb. 484, it was held that on a sale of personal property by a constable on execution, the property must be pointed out to the bidders, and specifically designated. It must not be left to any future act to ascertain what property is sold. Accordingly, where a constable levied upon thirteen sheep generally, and on the day of the sale the sheep of the debtor, numbering twenty or twenty-one, being present, the constable offered for sale thirteen of the sheep, without designating which, and on being asked by a bidder which sheep he sold, he replied, *the best, the fattest ;* it was held that he had no power to sell in such a manner as to authorize the purchaser to select thirteen sheep from the flock, and that the purchaser acquired no title to the sheep thus selected by him.

In the earlier case of *Sheldon* v. *Soper*, 14 Johns. 352, the court lay down the general rule, that nothing ought to pass at a public sale but what was then known and promulgated ; that it was a general and salutary principle ; one necessary in order to guard against fraud, and to preserve fairness in auctions ; that no property should pass at a sheriff's sale but what was at the time ascertained and declared.

So it was held in *Bostick* v. *Keizer*, 4 J. J. Marsh. 597, and in *Hazzard* v. *Benton*, 4 Harr. (Del.) 62, that the property in a slave will not pass unless the slave be shown at the time of the sale ; that is, unless the officer shows to the purchasers precisely what the property is that he offers for sale.

The cases cited by the plaintiff's counsel, *Smith* v. *Fritt, Gift* v. *Anderson, McNeeley* v. *Hart, Blount* v. *Mitchell,* and *Banks* v. *Evans,* (see *ante,*) and *Ainsworth* v. *Greenlee,* 3 Murph. 407, support the same position.

In the present case, it appears that at the time of the attachment three hundred and forty-six shares stood in the names of Hale and Jones, of which fifty-five were released, and one hun-

Jones v. Portsmouth & Concord Railroad.

dred and fifty sold before the adjournment, leaving apparently one hundred and forty-one shares ; but eighty-six shares only were in fact conveyed, and no explanation is given of the difference, while Jones by his notice denied that Hale and Jones owned more than one hundred and thirty-seven shares. These differences are unimportant, except as they show that there was an uncertainty as to the amount of the shares to be sold.

It then clearly appears that the officer stated to the company assembled at the sale, that by reason of the false and fraudulent notice of Jones it was impossible for the officer or Mr. Hatch to know or declare accurately how many shares were owned by Hale and Jones ; and he, therefore, after stating the number of shares on the books, and the number released and sold, offered for sale all the remaining right, title and interest which the debtors had in and to all shares and stock in said corporation, and the right, &c., thus offered, was sold without any further description or designation. No person could know for what he was bidding or what was its value, and it was not reasonable to expect any one to bid in such a case ; and for this cause we think the sale must be held illegal and void.

It is said that this uncertainty was caused by the acts of the debtor himself, and he ought not to be permitted to take advantage of a defect he had himself caused. It is by no means clear that the uncertainty grew out of the notice given by Jones, since there was an uncertainty growing out of the loose manner in which the corporate records were kept, as we shall have occasion to notice. But if it were so, the duty of the officer was plain. He was authorized to sell only such property as he could distinctly designate and describe, and he ought to have put up for sale a certain and definite number of shares, such as, upon the information he had, or could obtain, he believed were owned by the debtor, and have sold those and nothing more. The rule which forbids an officer to sell any property of the debtor but such as he can show to the purchasers, if visible, or describe definitely, if it is not, is founded upon considerations of public policy, and of justice to the debtor, since the effect of any

loose practice in this respect must be to destroy all competition at the sale.

The principle is also clear, that if the purchaser at a sheriff's sale, either alone or by concert with the officer, does any act in relation to the sale which is calculated to prevent a full and free competition in bidding, by reason of which the property sells at an undervalue, the sale will be set aside as fraudulent. Cases of this class are somewhat numerous. Thus, where an agreement was made to prevent competition at a sale of lands taken in execution, and the land sold at an undervalue, it was held a fraud; and the land being of greater value than the amount due on the execution, it was held satisfied. *Troup* v. *Woods*, 4 Johns. Ch. 228. So where the assignee of a mortgage struck off the property at an undervalue, on seeing a purchaser under the mortgagor coming, the sale was held fraudulent. *Jackson* v. *Crofts*, 18 Johns. 110. And in *Groff* v. *Jones*, 6 Wend. 522, a sale on execution was set aside as fraudulent, where real estate worth $10,000 was sold to satisfy an execution of $100, when a portion sufficient to satisfy the debt might have been sold separately.

Where a plaintiff prevented bidding, by offering to buy the property and to sell parts of it to others, the sale was set aside. *Mills* v. *Rogers*, 2 Litt. 217. A sale was held void in *Inskeep* v. *Secony*, Coxe 39, where the sheriff and purchaser acted fraudulently in the disposal of the property. And so in *Nesbitt* v. *Dallam*, 7 G. & J. 494, where town lots in a place of business were sold at an undervalue, and no notice of the sale was posted up within eighteen miles of the property. And in *Dougherty* v. *Linthicum*, 8 Dana 199, where an execution for less than $100 was levied on eighty acres of land, and the debtor's interest, subject to a mortgage, in five hundred and forty-six acres, both valued at upwards of $2100, and the right of the debtor in both was sold at once to the creditor for five dollars, the sale was set aside as fraudulent. So if a bidder prevent others from bidding at a sheriff's sale, by representations respecting the object of his bid, and then buy the property at an undervalue, the sale is void, as against public policy and as a

fraud on the debtor and creditors. *Bunts* v. *Cole*, 7 Blackf. 265. The cases of *Carson* v. *Law*, 2 Rich. Eq. 296 ; *Martin* v. *Ranlett*, 5 Rich. Eq. 541 ; *Fuller* v. *Abrahams*, 3 B. & B. 116 ; S. C., 6 Moore 316 ; *Wells* v. *Pleiffer*, 4 Yeates 203 ; *Reed* v. *Carter*, 2 Blackf. 410, and *Brodie* v. *Seagraves*, 1 Taylor 144, support the same principle.

All that was said and done by the purchaser to prevent others from bidding, may be given in evidence to show fraud. *Hoffman* v. *Strohecker*, 9 Watts 183.

The question is not as to the existence of moral fraud ; that is, the deliberate design to do a wrong. It is none the less a fraud in the eye of the law, if what was done has the effect to produce a sale at a great undervalue, that the parties have had no such purpose directly in view, or may have had a purpose, laudable in itself, for their object. As where one offered at a sheriff's sale to purchase negroes, and give them to the wife of the bankrupt owner, and it appeared that this offer prevented any bidding against him, the sale was held fraudulent, and was set aside, as against public policy. 2 *Rich. Eq.* 296.

Upon comparing the course pursued at the sale here in question, with these principles, it is apparent the sale cannot be sustained. If the notice given by Jones to the railroad company was calculated to prevent bidding and destroy competition, it was the duty of the creditor, officer and purchaser, to do nothing on their part in the least degree calculated to aggravate the mischiefs arising from his acts to all parties. No publicity should have been given to his notice, since it was not addressed to them, but inquiries should have been made to make the facts certain, and those facts should have been stated to those who attended the sale. Certain shares should have been offered for sale in reasonable amounts, and specificially sold, and others successively so long as they found shares belonging to him. Instead of this the officer who acted by direction of the creditors' attorney, announced and read to all assembled the notice of Jones, which he, so far as appears, had simply delivered to the president of the railroad, and had not in any way made public. The

officers in general terms declared their disbelief of its truth, but at the sale they gave it the strongest support, and threw the greatest discredit upon his title to any shares, by declaring that in consequence of Jones' course they were unable to state definitely how many shares he owned, and could not offer any definite number of shares for sale, and the sale was made of all Hale and Jones' right, &c., to any shares. It is impossible to doubt that this course must have destroyed all competition at the sale. And it can make no difference, if their conduct tended to produce a sale at a great undervalue, that Jones' course led to the same result. The sale must be set aside as fraudulent and against public policy; for no court can undertake to distinguish how much of the result was attributable to one or the other.

If Jones chose, from fraud or folly, himself to interfere with the sale of his property, by publicly denying his title, contrary to the fact, he has no ground of complaint against any one, if his property from that cause should sell at a very low rate. But we do not understand from the answers or the evidence that Jones did any thing to interfere with the sale, except to deliver his notice to the officers of the railroad, till this notice had been announced by the officer.

It is assumed in the argument for the defendants that Jones' notice was both false and fraudulent, and designed to injure the sale of the property; but this design seems not very credible, because such injury to the sale, however injurious to the creditors, was most destructive to his own interest. But upon that supposition, though he would be obliged to submit to the consequences of his own acts, he did not thereby become an outlaw, nor an object of attack beyond the limits of self defence. The officer had still his duties to perform, both to the creditor and to the debtor, imposed upon him by law from public policy, and for the security of all parties, and neither the creditor nor the purchaser at the sale will be justified in allowing himself to become a party to any violation of official duty on the officers' part.

Though the notice of Jones, upon the facts before us, is not entirely correct, yet it is by no means clear that it was designedly

false or fraudulent. Three hundred and forty-six shares are said to have stood on the corporate records in the name of Hale and Jones. Of fifty-five of these no account appears in the case ; and of the eighty-six shares here in question, the record was by no means correct, as we shall have occasion to consider. Of these, sixty-eight were the subject of a special agreement with the corporation, and the residue were in the hands of a trustee for Mr. Jenness, and it would seem probable these were excluded by Jones, as not being shares belonging to him, or to Hale and Jones. If that was so, it was not improper nor wrong for him, as soon as he was aware that the officer was about to sell this large number of shares, as belonging to Hale and Jones, because they appeared on the records of the corporation to belong to them, to give notice to the corporation to prevent their being prejudiced. It was perhaps necessary for the protection of his own rights, since the corporation might well allege that if he stood by and suffered these shares to be sold as his property in that form, he ought not afterwards to claim that he was entitled to have bonds instead of the shares. If the records were wrong, it was no injustice to any party to give such notice as would enable those interested to take the proper measures for their own security. It would not be just for the court to assume that this notice was false and fraudulent, when they find that, as to the shares here in question, the notice might well be regarded by Jones as both true and proper.

The railroad corporation are responsible for the acts of their agents, and if the injury of which the plaintiff complains is attributable to the conduct of their treasurer, they must answer for it. The shares here in question were borne upon the records as the property of Hale and Jones. We think they ought not to have been so entered. The shares were pledged to the railroad as an indemnity against their liability in certain trustee suits against Hale and Jones. By this pledge the special property passed to the railroad ; the right of Hale and Jones became reduced to a mere condition—a right to redeem by the discharge of the claim for which they were pledged. Their interest was

not one liable to attachment, and ought not to be so represented upon the records. If their interest was liable to be attached at all, by reason of their appearing by the records to be the owners, they must be liable absolutely, without regard to any claim of the railroad. It was, therefore, indispensable to the safety of the corporation that the shares should be placed upon the record as shares of the pledgees, and it was the duty of the treasurer so to record them, agreeably to the facts.

But without reference to the pledge, these shares were not the property of Hale and Jones. Though certificates had been issued to them, yet it is evident, upon an examination of all the writings upon the subject, which are to be construed together as parts of one contract, that these certificates were given up and surrendered to the corporation upon a special contract that the railroad should pay to Hale and Jones the sum of $6,800, either in these shares, or in bonds which both parties contemplated the corporation would be authorized to issue, at the election of Hale and Jones. By this special agreement the shares ceased to exist as such, and Hale and Jones became the holders, not of shares, nor of a right to redeem shares, but of a right to demand either bonds or shares, at their election. These shares should not, then, have been placed upon their records as shares of Hale and Jones, since they owned only a special contract, which was not liable to attachment.

If at the time of the sale the shares were to be regarded as still in existence, and subject to the conditional right of Hale and Jones, yet that right was wholly dependent upon the election of Hale and Jones. If they elected to take bonds, their right to the shares was clearly at an end, and the corporation had clearly no right to deprive them of an election, by issuing certificates of shares before they had made their choice, or by issuing certificates of shares to others, when they had elected to take bonds.

It is said in argument, that the contract of the railroad company to issue bonds instead of shares was an incident of the stock, and passed with it to the purchaser, but we think this idea

entirely groundless.  The contract relative to the stock and bonds was a mere personal contract, independent of them, and having no one character of an incident.  Such a contract could not by any law of this State be seized or sold on execution, either alone or with the stock.  By losing his interest in the shares, Jones might lose the benefit of his contract, but the purchaser would not acquire any interest in the special contract, unless it was specially assigned to him, which could not be done by a sale on execution.  On the contrary, such a contract, giving Jones an election to demand stock or bonds of the company, necessarily reduced his claim to a mere contract, and destroyed all pretence that he was the owner of the shares, until he had made his election of shares and they were issued.

Eighteen of the shares here in question were, at the time of the attachment and sale, standing in the name of the defendant Vennard as trustee for Jenness.  They ought not to have been allowed to remain upon the records in the name of Hale and Jones, and they were not liable to be sold for their debts, even if they had some contingent equitable interest, unless the transfer to Vennard was fraudulent, which is not pretended.  The officers of the corporation consequently cannot be justified in issuing certificates of these shares to Mr. Hatch.

The relief prayed for is, 1.—That the railroad, its officers, &c. may be enjoined from selling the bonds necessary to discharge their contract with Hale and Jones, and the temporary injunction issued for this purpose must be made perpetual.  2. The bill prays that the railroad, its officers, &c., may be decreed specifically to perform their contract, by converting the sum of $6823.14 into a corresponding amount of bonds to be issued to the plaintiff.  3. That Mr. Hatch may be decreed to surrender the certificates of shares sold and wrongfully conveyed to him; and, 4, that the railroad may issue certificates of eighteen shares in the railroad to the plaintiff.

And these decrees are proper to be made, with costs.

The bill prays for other and further relief, the necessity for which we have not considered.