## Tolen v. Tolen.

Petition by a wife for a divorce. The marriage was solemnized in *Kentucky,* where the parties then resided. The husband there, in 1822 or 1823, deserted his wife, and has ever since lived in adultery with another woman. Two or three years after the desertion, the wife removed to this state, where she has since that time resided. The husband was never resident here; and the notice to him of the pendency of this suit was by publication. *Held,* that the Circuit Court, under the statute, has jurisdiction of the cause.

The constitutional provision, prohibiting laws impairing the obligation of contracts, does not extend to general laws authorising divorces; provided the legislature, in the exercise of its power, does not pass beyond the rights of its own citizens, and act upon the rights of the citizens of other states.

In a suit for a divorce, the *lex domicilii* is the rule of decision.

ERROR to the *Decatur* Circuit Court.

Stevens, J.—The plaintiff filed her petition in the *Decatur* Circuit Court praying a divorce from her husband, the defendant; by which it appears they were married in the state of *Kentucky* where they both resided, and that they continued to reside there as man and wife, after their marriage, until in the year 1822 or 1823 when the defendant eloped with an adulteress, with whom he has ever since lived, and by whom he has had five or six children; that two or three years after the clopement, the plaintiff removed to the state of *Indiana* and permanently settled in the county of *Decatur,* where she has resided for the last five years. The Circuit Court decided that they had no jurisdiction of the case, because the marriage and causes of divorce both took place in the state of *Kentucky,* and the defendant has never resided in this state.

A more unsettled question could not perhaps be presented to the Court. It has been more or less discussed in the Courts of

Europe and America for many years, and many of the decisions are apparently conflicting. Divorces are of two kinds, a mensa et thoro, and a vinculo; and the causes of divorce are as different and various as there are different states and governments. By the civil law, either party might renounce the marriage union at pleasure. Justinian for a short time abolished divorces, but was compelled to revive them again. He restored the unlimited freedom of divorce, and gave as a reason that the hatred, misery, and crimes, which often flowed from indissoluble connections, required that marriages should be subject to dissolution by mutual will and consent. By the ecclesiastical law, a marriage may be dissolved and declared void ab initio, for canonical impediments existing previous to marriage. In the Roman Catholic states, heretofore, divorces were not allowed, because marriage was considered by them a sacrament and indissoluble. The Napoleon Code admits of divorces for several named causes to be pronounced by the tribunals, where the parties cannot agree on a dissolution, and in all cases where the parties agree thereto. In England, a divorce a vinculo is seldom granted except for adultery, but divorces a mensa et thoro are very common and often for very trifling causes. In some of our states, divorces a vinculo are restrained by constitutional provisions, which require the assent of two-thirds of the legislature founded on previous judicial investigation. In some, divorces are granted solely by special acts of the legislature; in others, divorces a vinculo are judicially granted for adultery only; and in others, not only for adultery but also for ill treatment, abuse, abandonment, and many other causes. In our state, divorces a vinculo only are granted; a divorce a mensa et thoro is not authorised. The causes of divorce are, 1, a former subsisting marriage; 2, impotency; 3, adultery; 4, abandonment; 5, condemnation for a felony; 6, barbarous and inhuman treatment; and 7 and lastly, "in any other case where the Court in their discretion, shall consider it reasonable and proper that a divorce should be granted."

The first point is, how far the legislature of a state can interfere with a marriage contract under the constitution of the United States, which prohibits the states from passing laws impairing the obligation of contracts.

In the case of Dartmouth College v. Woodward, 4 Wheaton,

629, Judge *Marshall* says, "this provision of the constitution never has been understood to embrace other contracts, than those which respect property, or some object of value, and confer rights which may be asserted in a Court of justice. It never has been understood to restrict the general right of the legislature to legislate on the subject of divorces. Those acts enable some tribunal, not to impair a marriage contract, but to liberate one of the parties because it has been broken by the other." And in the same case Judge *Story* says, "A general law regulating divorces from the contract of marriage, like a law regulating remedies in other cases of breaches of contracts, is not necessarily a law impairing the obligation of such a contract. It may be the only effectual mode of enforcing the obligations of the contract on both sides. A law punishing a breach of a contract, by imposing a forfeiture of the rights acquired under it, or dissolving it because the mutual obligations were no longer observed, is in no correct sense a law impairing the obligations of the contract." The Court is of opinion that the states, in the fair exercise of their legislative powers, do not necessarily involve a violation of the obligation of contracts in passing general laws authorising divorces, if they do not, in the exercise of those powers, pass beyond the rights of their own citizens and act upon the rights of the citizens of other states, and thereby produce such a conflict of the sovereign powers and collision of the judicial powers of the other states, as to render the exercise of such powers incompatible with the rights of the other states, and with the constitution of the *United States*. We believe that all Courts and jurists agree, that a divorce granted under the laws, and by the constituted authorities, of the government or the state where the parties are domiciled, and where the marriage contract was entered into, is valid and binding every where. The great difficulty is, where the divorce is granted out of the state where the marriage contract was entered into, and afterwards the parties return to their native state. How are the Courts of the native state to treat the foreign divorce? This brings us to the second point in this case, which is,—

Does the *lex loci* form a part of the marriage contract, or is it governed by the *lex domicilii?*

In *England*, it is settled that no foreign Court is competent to pronounce a divorce *a vinculo* of *English* marriages, for any

52

Nov. Term,
1831.

TOLEN
v.
TOLEN.

cause other than such as would be warranted by the *lex loci contractus*. In the state of *New-York* the *English* doctrine is adopted, and no divorce of *New-York* marriages, pronounced by any foreign tribunal out of the *United States*, is valid, unless it be for adultery; that being the only cause of divorce in that state. But whether a divorce, judicially granted in one of these *United States* of a *New-York* marriage, would be entitled to a different consideration in that state, has not as yet been decided. If it would, it is owing to the force which the national compact, and the laws made in pursuance of it, give to the records and judicial proceedings of other states. Lord *Meadowbank*, in the High Court of Session in *Scotland*, in reviewing the *English* doctrine on the subject of divorces, says that the relation of husband and wife, wherever originally constituted, is entitled to protection and redress by the laws of the country where the parties may reside. That by marrying in *England*, the parties do not become bound to reside there forever, nor are they bound to treat each other in every country according to the laws of *England*. That a redress of a violation of the duties of the marriage state, belongs to the laws of the country where the parties reside. There is nothing in the will of the parties that gives the *lex loci* any particular force over the marriage contract, or that impedes the course of the *jus publicum* in relation to it. That the relation of husband and wife is acknowledged *jure gentium*; and the right to redress wrongs incident to that relation, exists in the laws of the country wherever the parties may be, though the marriage may have been celebrated elsewhere. Other contracts are modified by the will of the parties, and the *lex loci* becomes essential; but not so with matrimonial rights and duties. Unlike other contracts, they cannot be dissolved by the will and consent of those who made them. Matrimonial contracts are *juris gentium*, and admit of no modification by the will of the parties. Hence, it is not necessary that a foreigner should have acquired a domicil *animo remanendi*: the law of the country at once applies its own rules to all domestic relations, otherwise a numerous description of persons would be permitted to violate with impunity the obligations of domestic life. That each country is bound to look to its own laws in the administration of that department, otherwise the whole order of society would be disjointed. If the *lex*

*loci* followed and governed the parties wherever they went, it would lead to inextricable difficulties, and the country would be filled with privileged casts, each living under separate laws. It is immaterial where the marriage was entered into, it is binding in all countries, not by virtue of the *lex loci*, but by the law of nations.   If the *lex loci* were the ligament that continued to bind it, the same law of course would have to be applied to when a dissolution of it was called for; and the parties under a *Prussian* marriage, would be entitled to a divorce *a vinculo* for any of the great variety of whimsical causes, for which a divorce is allowed by the *Prussian* code.   This much has been said for the purpose of throwing some light on the subject, and from the best view which we can take of the whole ground, we are of opinion that the *lex domicilii* must govern the marriage contract, and that the laws of the country wherever the parties may be domiciled, must be applied to their domestic relations.

The third and last point in the case is, had the Circuit Court jurisdiction?

It appears from the plaintiff's own showing, that the marriage contract was made and entered into in the state of *Kentucky*, where the parties both resided; that the causes of divorce arose there; and that the defendant does not now reside, nor has he ever resided, in this state.   In the states of *New-York* and *Massachusetts* it has been decided, that where one or both of the parties remove into another state, for the purpose of procuring a divorce contrary to the laws of their own state, without an absolute change of domicil, such divorce is null and void, it being obtained by fraud; and that the Court pronouncing such decree has no jurisdiction, having been imposed upon by fraud and collusion.   These decisions we think are good law, but cannot apply to the case under consideration.   There is neither fraud nor collusion in this case; the plaintiff is now and has been for several years a *bona fide* citizen of this state, and has acquired a domicil *animo remanendi*, and is entitled to the benefit of the laws.   The statute of the state of *New-York* only authorises divorces *a vinculo* in the single instance of adultery; and a bill for a divorce can only be sustained for that cause in two cases: one, where the married parties are inhabitants of the state at the time of the commission of the adultery; the other, where the marriage is entered into in the state, and the par-

ty injured is an actual resident at the time the adultery is committed, and at the time of filing the bill. We have no such statutory provisions as these, and therefore the judicial decisions of that state, founded as they are on these statutes, can shed but little light on the point now under consideration. The statute of this state provides, that absolute divorces shall be granted on the petition of the party aggrieved, and that all persons who shall have resided in the state one year, shall be entitled to the benefit of the act. It also provides, that proceedings may be had against non-residents as well as residents, and points out the mode of giving actual notice to residents, and constructive notice to non-residents. It does not require that the defendant should be a resident of, or that the marriage contract should be entered into in, or that the causes of divorce should arise in, the state. The Court is of opinion that if the statute is constitutional, it gives the Circuit Court jurisdiction of the case; and that the statute is constitutional it has no doubt.

The questions, whether divorces granted in one state will be valid in another, under all circumstances, and if valid to what extent, are not now before the Court. These questions are grave questions under our federal constitution, and if they should ever be presented, they will be entitled to the most cautious and mature consideration.

*Per Curiam.*—The judgment is reversed with costs. Cause remanded, &c. (1).

*Smith,* for the plaintiff.
*Brown,* for the defendant.

(1) The reader will find the law concerning divorces examined at large in Kent's Commentaries, 2d Ed. Vol. 2, pp. 95 to 128. Vide, also, *Indiana* R. C. 1831, p. 213.