## MARY ANN DITSON *v.* GEORGE L. DITSON.

By the statute law of Rhode Island, the jurisdiction of its courts in divorces, whether *a mensa et thoro* or *a vinculo*, depends solely upon the residence in the state or citizenship of the petitioner.

Rules and practice in Rhode Island as to notice to an absent or non-resident party to a marriage sought to be affected or dissolved by a petition for divorce.

By *the general law*, the jurisdiction of the courts of a country in divorce depends, not upon *the place* of the marriage or of the breach of its duties; but, marriage being a relation involving the *status* of a party to it, upon the right of a country or nation to determine the status of one of its own citizens or subjects, a party to the relation.

Jurisdiction over the petitioning party alone, as a citizen of a state, is sufficient by the general law to give jurisdiction to the courts of the state to divorce such party, upon such notice, personal or constructive, to the other party to the marriage sought to be affected or dissolved, whether such party be present in or absent from the state, as is possible or customary under the circumstances.

A decree of divorce granted by the courts of a state having jurisdiction over the petitioning party as a citizen of the state, is, by article 4, sect. 1, of the Constitution of the United States, valid in all the States.

Although, in general, the domicil of the husband is the domicil of the wife, yet if he be guilty of such act or dereliction of duty in the relation as entitles her to have it partially or totally dissolved, she may establish a separate jurisdictional domicil of her own.

A female citizen of Rhode Island, married in New York to an Englishman, with whom she lived for several years abroad, and by whom she was finally deserted in Massachusetts, is entitled to a divorce *a vinculo* in Rhode Island upon the ground of such desertion, and the courts of Rhode Island have upon her petition under the general law, in accordance with the local law, jurisdiction to grant it, although her husband had never been within the jurisdiction of Rhode Island, and although his place of residence and of temporary sojourn at the time of the petition being unknown, only constructive notice of the pendency of the petition had been given to him by publishing such notice for the space of six weeks in a newspaper printed and issued in Rhode Island.

PETITION FOR DIVORCE. The petition represented the petitioner as of Little Compton, in the state of Rhode Island, and that she had resided within the state for the last three years; that she was married to George L. Ditson in the city of New York, in October, 1842; that she has at all times faithfully performed her duties as a wife, but that her said husband has

treated her with extreme cruelty; has neglected and refused, being of sufficient ability, to provide necessaries for the subsistence, and has wilfully deserted her for the last three years, and been guilty of other gross misbehavior and wickedness repugnant to, and in violation of, the marriage covenant; that her said husband is not within this state, nor within fifty miles of Newport. Prayer, for a decree of divorce from the bond of matrimony between the petitioner and her husband, and that the name of the petitioner be changed from her name of Mary Ann Ditson, to her maiden name of Mary Ann Simmons, and for further relief.

Accompanying the petition was an affidavit of the petitioner, stating that her husband was not a resident of this state, and was in parts unknown to the petitioner. The petition was filed in the clerk's office of the supreme court for the county of Newport, on the 9th day of July, 1856; and the clerk certified that he had given six weeks' notice of the application by publishing it in the Newport Mercury for that period next before the sitting of the court at the present August term.

It appeared that the petitioner, then Mary Ann Simmons, was married, without the knowledge or consent of her father, whilst a girl at school in New York, to George L. Ditson, an Englishman, to whom she had been introduced outside the school, the ceremony being performed by Dr. Spring on the 13th of November, 1842; that after marriage, Mr. and Mrs. Ditson went to Europe, and from thence to Cuba, where they resided for several years; that shortly after their return, Ditson went to Europe by himself, leaving his wife, then in a feeble and emaciated condition, without any provision, to be supported by her father, and was gone about two years; that he returned, however, and lived with her again for a short period, treating her morosely and unkindly; but there was no proof of extreme cruelty, though he locked her up once in her chamber for making a purchase that displeased him, and treated her with neglect and spoke of her in a careless and indifferent manner. The last time he left her was in Boston, whence he went to Europe, saying just before he went, to a witness, "that he meant to go away, and did not care a damn for Boston or any body in it."

Upon being thus deserted, the petitioner came to live with her father at Little Compton, R. I., of which place he was a native, and then a domiciled inhabitant. Ditson had been absent, at the time of filing the petition, for upwards of three years, during which time he had not once communicated by letter or message with his wife, or left, or made, any provision for her support, though of sufficient ability so to do. From the time of his desertion, the petitioner had lived with her father in Little Compton, except about three months of the time, which she had passed in Newport, R. I. During this time she had been wholly supported by her father, except, in what manner did not appear, the little that she had been able, by her own exertions, to do for herself. It was admitted that Ditson had never been domiciled in Rhode Island, or even,·to the knowledge of any witness, been within the state. It was not known that he had any domicil in the country; he having resided ·since .the marriage, either in Europe or Cuba, and having remained but a short time either in Boston or New York. No personal notice of the application for divorce had been given to him, and none attempted to be given; since, from his silence, the place where he resided or temporarily dwelt, was wholly unknown to the petitioner or to her friends.

Under these circumstances, the chief justice intimating a doubt concerning the jurisdiction of the court over the cause, desired the counsel for the petitioners to search authorities and present them to the court upon that subject; the court being satisfied that the petitioner had proved by the desertion of her husband without cause, and by his neglect to provide for her support, being of sufficient ability so to do, a case for divorce *a vinculo* under the statute, provided the court had, under the circumstances proved, power and jurisdiction to grant her petition.

*Francis E. Hoppin*, for the petitioner, took the following points :—

*First*, that the petitioner is an actual *bonâ fide* resident of Rhode Island, and had actually resided therein for upwards of three years before filing her petition; (Dig. 1844, pp. 264, 265,) coming to this state under circumstances which enabled

her to gain a domicil here distinct from and independent of that of her husband. *Harteau* v. *Harteau*, 14 Pick. 181.

*Second.* That the petitioner being a domiciled inhabitant of this state, was entitled, in her desertion, to the protection and relief of its laws. *Harding* v. *Alden*, 9 Greenleaf, R. 140. *Tolen* v. *Tolen*, 2 Blackf. 407. There having been no change of residence by the petitioner for the purpose of evading the laws of any other state, the law of the place of actual residence of the petitioner must govern the dissolution of her marriage, irrespective of the place of its celebration. *Jackson* v. *Jackson*, 1 Johns. R. 434. *Broden* v. *Fitch*, 15 Johns. R. 120. *Bradshaw* v. *Heath*, 14 Wend. 407. Story's Confl. Laws, § 230, ed. 1836. *Clark* v. *Clark*, 8 Cushing, 385. *Barber* v. *Root*, 10 Mass. 260. *Harding* v. *Alden*, 9 Greenl. R. 140. *Tolen* v. *Tolen*, 2 Blackf. 140.

*Third.* To deny the petitioner relief under the circumstances of the case, upon the ground of want of jurisdiction over her husband, because he had not been served with personal notice, would enable a husband, especially a foreigner, as in this case, by deserting his wife, to deprive her of all the redress which the laws of this state provide for her as one of its citizens.

*Fourth.* To entitle the court to jurisdiction over the dissolution of the marriage of one of its citizens, it is sufficient if the court have jurisdiction over the petitioner, and personal service upon the other party to the marriage need not be, if it cannot be, made. Bishop on Marriage and Divorce, §§ 728, 730, 731, 732, 735, 739.

AMES, C. J. The " Act regulating marriage and divorce " in this state, requires, in words, no other jurisdiction in this court over the parties to a petition for divorce, than that the petitioner should have *resided* in the state for *three years* next before the preferring of the petition; with a discretionary power in the court to dispense with *that particular term,* as it has been construed, of *residence* or *domicil.* Dig. 1844, p. 265, § 11. Public Laws since Dig. 1844, p. 670. This dispensing power has, however, been very sparingly exercised by the court, and never, unless indeed the court may have been misled by false testimony, except in cases where a long previous residence, and especially by natives of the state, had been interrupted but a short time

within the three years preceding the petition, or, in which some peculiar circumstances loudly invoked the aid of the court, such as an open adulterous marriage by the wife, the petitioning husband having resided in the state for a long portion of the three years, and the court being satisfied that he came to the state, not for the purpose of divorce, but *bonâ fide* to *reside* here, as a *domiciled* or *settled inhabitant*. Of late years, it has never been dispensed with where the alleged cause of divorce, occurring in another state, was not a cause for the species of divorce asked, in *that* state. There is nothing, however, in the statute, as we regard it, which *obliges* the court to take jurisdiction of such a petition merely because one of the parties only, the petitioner, is a resident of the state, though he or she may have been such for the period of three years next preceding the petition; although, it must be admitted, that the practice under the statute has proceeded upon that supposition. By the 10th section of the act of this state "regulating marriage and divorce," this court is authorized " by rule or otherwise to prescribe the notice to be given on petitions for divorce, alimony, separate maintenance, and custody of children, and may issue such process as may be necessary to carry into effect the powers conferred on them by this act." Dig. 1844, pp. 264, 265. By the 14th rule of the court, made by the authority of this act, " On all petitions for divorce, the adverse party, *if resident within this state*, or within fifty miles of the place of trial, shall be notified and served with a copy of such petition, three weeks at least before the sitting of the court; and if resident without the state, and more than fifty miles from the place of trial, notice shall be given in some one of the public newspapers, printed in Newport or Providence, six weeks before the sitting of the court; and such petitions as contain an allegation that the adverse party is not resident in this state, or within fifty miles of the place of trial, shall be accompanied with an affidavit of the petitioner, stating his or her knowledge and belief of the place of residence of such adverse party." Rules of Sup. Ct. of R. I. prefixed to Vol. I. R. I. Reports, pp. xii and xiii. Under this rule, this court has acted in giving constructive notice to non-resident defendants to petitions for divorce, in cases where relief of this kind

Ditson *v.* Ditson.

has been asked by resident citizens, and has, upon proper proof, afforded that relief, even though the defendants have never resided within this state or subjected themselves in any way to its jurisdiction. If, however, it appeared from the affidavit of the petitioner or otherwise, in the course of the hearing, that the petitioner knew of the place of residence of the other party, and that place was within the United States, the practice has for many years been to continue the petition, and order personal notice of the pendency thereof to be given to such party through the mail. In the case at bar, under this rule, upon affidavit of the petitioner that according to her best knowledge and belief, the defendant, her husband, doth not reside in this state, or within fifty miles of the town of Newport, but is in parts unknown, he being a foreigner, the notice prescribed by the rule has been given, by publication of the same, for the space of six weeks before the sitting of the court, in the Newport Mercury, a paper printed in the city of Newport. If, however, by the general law pertaining to this subject, a decree of divorce *a vinculo*, made here, be void elsewhere, unless both parties to the marriage are resident in this state at the time of the application, or the respondent has been served with notice in the state, or being served without notice out of it, has appeared and submitted himself to our jurisdiction, so far from feeling compelled by the language of our statute, as it stands at present, to pass such decrees, we should feel compelled to refuse to pass them, lest they should bring upon the resident petitioner, in such cases, greater evils than those that our statute was designed to remedy.

When, therefore, this question presented itself to the court for the first time since I had the honor of presiding over it, in the case at bar, my brethren on the bench, though less doubtful with regard to our jurisdiction in such a case than myself, consented, at my request, to reserve the question for mature consideration and deliberate decision, in order that the course now adopted might for the future guide ourselves as well as those subject to our jurisdiction. Every case, during our recent circuit, in which it has since arisen, has also been reserved; and the question having been argued before us by the counsel in

this case, was already under consideration, when our attention was attracted by a remark of the learned chief justice of Massachusetts, in delivering the judgment of his court in the recently reported case of *Lyon* v. *Lyon,* 2 Gray, 367, decided in 1854, that this court, in its decree of divorce, reviewed and considered in that case, had violated, upon this subject, principles of *general* law. Such a remark, coming from a quarter entitled to so much respect, has only induced us more carefully to scrutinize by the light of the *general* law the true grounds of jurisdiction in such cases; so that however, in *ex parte* hearings of them, we may be occasionally misled as to *facts,* it may not be supposed that we are careless of, or would deliberately violate in this respect settled principles of law.

In the case of *Lyon* v. *Lyon, supra,* which was an application for divorce on the part of a husband residing in Massachusetts, a former decree of this court divorcing the same parties *a vinculo* on the application of the wife, was declared void; partly on the ground, that it was obtained here by a domiciled inhabitant of Massachusetts in fraud of a statute of that state, which avoids divorces obtained out of the state for causes occurring in it, or for any cause which would not authorize a divorce by its laws, when obtained by a citizen of Massachusetts who goes "into any other state or country *in order* to obtain the divorce." We have no remark, except of approval, to make of the statute of Massachusetts, or of this decision under 'it, upon the facts made to appear *ex parte* to *that* court, probably quite different from the facts made to appear in the same matter before, *ex parte,* to *this.*

It is a well-settled principle of *general* law upon this subject, that the tribunals of a country have no jurisdiction over a cause of divorce, wherever the offence may have occurred, if neither of the parties has an *actual bonâ fide* domicil within its territory; and this holds, whether one or both the parties be *temporarily* residing within reach of the process of the court, or whether the defendant appears or not, and submits to the suit. This necessarily results from the right of every nation or state to determine the *status* of its own domiciled citizens or subjects, without interference by foreign tribunals in a matter with which they

have no concern.  Bishop on Marriage and Divorce, § 721, p. 721, 2d ed. and cases cited.   We entirely agree with the judgment given by the supreme court of Massachusetts on this point, in the well-considered case of *Hanover* v. *Turner*, 14 Mass. 227, 231; in which both this rule, and the reason for it are stated with that precision and largeness of view, which indicate that the court fully comprehended the question before them as a question of general law; a kind of praise which cannot, with any justice, be bestowed upon many American cases upon this important and interesting subject.

Our attention has been attracted to the case of *Lyon* v. *Lyon*, because, in it, the decree of this court divorcing Mrs. Lyon is arraigned, and declared void, upon general principles of law apart from the statute, that is, as we understand it, apart from the principle of general law embodied in it.   The learned court are made to say, that " upon general principles of justice and policy," the decree in question would, " before the revised statutes," have been held void, " partly on the ground that it was a proceeding in fraud of our law," to which we agree upon the facts proved to the court, " and partly because the court of the foreign state (Rhode Island) could have no jurisdiction of the *subject-matter* and of *both* the parties."   2 Gray, 368, 369.   And again, at the conclusion of the opinion, the court recur to the same matter: " But if not within the statute, *for the reasons before given*, we are of opinion that the decree in question is void, upon general principles of law."   Ib. 370.   By this we understand that the learned court must have intended,—*First*, that by the general law applicable to the subject of divorce, the supreme court of Rhode Island had no jurisdiction of *the subject matter* either because *the marriage* took place, or because *the alleged cause of divorce* occurred out of its jurisdiction ; and *second*, because the court had not jurisdiction of *both* parties, the husband not being domiciled in Rhode Island, and no effectual service upon him *within the state* having been obtained, and he, by appearance, not having submitted his cause to the jurisdiction of the court.

With regard to the alleged want of jurisdiction over " *the subject-matter*," which includes, as distinct from jurisdiction over

the parties, only the marriage and cause of divorce, we think that there must be some inaccuracy in the language of the report. We think so, because, as said by Judge Story, " The doctrine now *firmly* established in America upon the subject of divorce is, that the law of the place of the actual *bonâ fide* domicil of the parties gives jurisdiction to the proper courts, to decree a divorce for any cause allowed by the local law, without any reference to the law of the place of the original marriage, or to the place where the offence for which the divorce is allowed was committed." Story's Conflict of Laws, § 230 *a;* and Bishop on Marriage and Divorce, § 720, and note 2, where see a very instructive note, containing all the authorities, domestic and foreign. See also Ib. §§ 740, 741, &c. We think so, more especially, because, as we understand the scope of his reasoning, no one has vindicated this doctrine of American law with more ability than the present learned chief justice of Massachusetts, in delivering the judgment of his court in the case of *Harteau* v. *Harteau*, 14 Pick. 181, 185, 186. We regard, therefore, the alleged want of jurisdiction in Mrs. Lyon's case, on the ground of want of jurisdiction over *the subject-matter* as something distinct from want of jurisdiction over *both parties*, as a mere inaccuracy of statement; the court intending, perhaps, that, not having jurisdiction over *both* parties, the supreme court of Rhode Island had neither jurisdiction over the *marriage* nor the *delictum,*—that is, over *the subject-matter.* It is true that in *Barber* v. *Root*, 10 Mass. 265, 266, a case referred to by the learned court in *Lyon* v. *Lyon* for the grounds of their judgment, stress seems to be laid upon the place of contract and of the place of the violation of it, as affording or not affording ground for jurisdiction, as the case might be, over the *subject-matter ;* partly upon the idea of the subsistence or non-subsistence of the contract within the territory of the court taking jurisdiction, and partly, so far as the *delictum* was concerned, upon some notion of police. We understand, however, the supreme court of Massachusetts to have rejected both these false and confused notions ; and in *Hanover* v. *Turner*, 14 Mass. 230, 231 ; *Harteau* v. *Harteau*, 14 Pick. 182–187 incl., and therefore in *Lyon* v. *Lyon*, 2 Gray, 368–370, to be understood as regarding

marriage not as an executory contract between the parties to it, but as an universally recognized relation between them, deeply affecting their *status*, or legal and social condition, and for that reason, properly dissoluble according to the law of the country in which they are domiciled, without reference to the law of the place of the original contract of marriage, out of which the relation has emerged. We also understand the result of these decisions to be, that a breach of the duties of this relation, though sometimes a crime, and when such, punishable in that character only in the place where it is committed, yet, considered as a cause of divorce, to have no locality; and, therefore, to be regarded as a cause of divorce, wherever occurring or committed, equally as if it had occurred or been committed within the territory of the state having jurisdiction over *the parties*, in the sense of *both* parties to the relation.

We may remark in passing, although we do not mean to launch into the sea of conflict on this subject between the laws of England and Scotland, that whilst it is the doctrine of both the Scotch and English courts, as well as of our own, that the place where the offence is committed, whether in the country where the suit was brought, or a foreign country, is immaterial to jurisdiction in divorce, it is the equally well-settled doctrine of the Scotch courts that the *place of marriage* is also immaterial; and this doctrine, as a doctrine of Scotch law, has recently received the approbation of the house of lords, sitting upon a Scotch appeal, if some doubt be not also thrown by the decision upon the peculiar doctrine of the English law, as held in *McArthy* v. *McArthy*, and *supposed to be held in Lolley's Case*, that an *English* marriage cannot be dissolved by a foreign tribunal. *Geils* v. *Dickenson*, 20 Eng. L. & Eq. R. 1, 10, 11, opinion of Lord St. Leonards; and see Bishop on Marriage and Divorce, §§ 745–761 incl., and cases cited.

The other principle of general law mentioned in the decision of *Lyon* v. *Lyon*, *sup.*, as violated by this court in divorcing Mrs. Lyon, to wit, that the court had not jurisdiction over *both* parties to the marriage, presents a more difficult question, and one which, as we have said, had attracted our attention previous to our knowledge of the above decision and opinion of the supreme court of Massachusetts.

Ditson *v.* Ditson.

The question raised by the case at bar, and for the decision of which in the affirmative this court is said by the supreme court of Massachusetts in *Lyon* v. *Lyon* to have pronounced a decree in favor of Mrs. Lyon void upon general principles of law, is, whether the *bonâ fide* domiciliation of the *petitioning* party in this state is sufficient to give this court jurisdiction to grant a divorce *a vinculo,* although the other party to the marriage to be dissolved has never been subject to our jurisdiction, never been personally served with notice of the petition within the state, or appeared and answered to the petition, upon constructive notice, or upon being served with personal notice of it, out of the state ? In other words, the question is, whether, as a matter of general law, a valid decree of divorce *a vinculo* can be passed in favor of a domiciled citizen of the state, upon mere constructive notice to the foreign or non-resident party to the marriage, against whom, or to dissolve whose marital rights over or upon the petitioner, the aid of the court is invoked ?

Such a question, as said by a late excellent writer upon this subject, can never arise in England, where this whole matter, so far as it is a matter of *judicial* determination, is committed to the ecclesiastical courts. Those courts have no power to dissolve marriages, good *ab initio,* for supervenient causes, and can only act for such causes upon suits for divorce a *mensa et thoro* and for restoration to marital rights; their jurisdiction in *jactitation* suits, being confined to the ascertainment of whether a marriage reputed or boasted of ever existed, and in *nullity* suits, to the declaring marriages void, or avoiding them from the time of the decree, which, from causes preëxisting the ceremony of marriage, were, by law, either void or voidable *ab initio.* The common law of their jurisdiction, as shown by the 106th canon of 1603, and afterwards enacted by statute, was, that no person could be cited out of his diocese ; the court interfering in such matters, it is said, for the good of souls merely, and its jurisdiction being confined, with that of the bishop or ecclesiastical dignitary represented by it, to the care of the souls of those domiciled, or at least present within the diocese. It is also held that the canon does not apply to persons having no fixed residence in the kingdom, but only to persons cited who are inhab-

itants and dwellers in some *diocese* or *district* placed by law under some particular ecclesiastical jurisdiction, and that the statute does not extend to Ireland. Bishop on Marriage and Divorce, § 733, and p. 734, n. 2, 2d ed. 1 Blacks. Com. 441, 442 and notes. 3 Ib. 92–95 and notes. 4 Ib. 275, 276, *vide passim*, N. Y. Ed. 1827. It is evident that the peculiar jurisdiction of these courts does not depend upon the *domicil* of the libellant, who, though a foreign or Scotch resident, may follow his wife, or she her husband, into the proper ecclesiastical tribunal of England for the appropriate relief to the case which it is empowered to give. The court must, however, have jurisdiction over the *defendant*, or its decree, from its nature, could have no personal effect upon him or her ; but except the defendant *be domiciled* in some particular *diocese* or *district* it is apprehended that a *temporary* residence of the defendant in such district or diocese, is sufficient to give the court jurisdiction. In *Geils* v. *Dickenson*, 20 Eng. L. & Eq. R. 1, 9, 10, 13, 14, the marriage having taken place in England, between a Scotchman and an Englishwoman, the parties were domiciled in Scotland, paying only occasional visits to England. They resided in Scotland until September, 1845, when the wife left her husband, and returned to her mother's house in England. In October, 1845, the husband instituted in the arches court of Canterbury a suit for restitution to conjugal rights, to which the wife gave in a " responsive allegation," in which she stated various acts of cruelty and adultery committed by her husband in Scotland, and became an actor in the cause as well as a defendant, by praying that she might " be separated from bed, board, and mutual cohabitation " with her husband, by reason of his adultery, and cruel and unnatural practices upon the person of the proponent. The arches court entertained both the original suit and the new action raised by way of defence in it, and finding the alleged adultery of the husband proved, divorced the wife, as she desired, from bed, board, and cohabitation with her husband, until they might be reconciled to each other, inhibiting both from contracting another marriage during the lifetime of the other. The ecclesiastical court in this case took jurisdiction at the suit of a plaintiff domiciled in Scotland pursuing his wife thence to Eng-

land for its relief against *her*, freshly returned to its jurisdictional district, and again upon her "responsive allegation," both as a *defendant* and *actor* in the cause, granted her a divorce. The wife subsequently raised an action for divorce *a vinculo* in Scotland; for the same acts of adultery by virtue of which she defended herself and obtained the divorce *a mensa et thoro* in England, which was granted by the court of session, and afterwards confirmed, on appeal, by the house of lords ; and although the only question, both below and above, turned upon the effect of the decree of the court of arches—that is, whether it estopped her from further relief, or was legally consistent with it,—neither court nor counsel intimated a doubt as to the jurisdiction of the court rendering the decree. It is evident, that from the peculiar principles which regulate the jurisdiction and action of the English ecclesiastical courts, in matters of divorce, very little light can be gathered to aid us in our investigation.

As a matter of general law, this must be sought in the legal nature of marriage, and what it consequently is, upon which a decree of divorce operates, and in the jurisdiction of a state over its own citizens and subjects, as well as in the decisions of courts bearing directly upon this point, or elucidating the principles which govern its decision. It is undoubtedly true, as a common-law principle, applicable to the judgments of its courts, that they bind only *parties* to them, or persons in such relation to the parties and to the subject of the judgment, as to be deemed privies to it. The rule of this system of jurisprudence, which brings privies within the operation of the notice served upon the principals to a judgment and binds them by its effects, is founded upon quite as clear a policy, and is sanctioned by quite as complete justice, as that which renders the judgment obligatory upon those whom they represent. It is founded upon the great policy *ut sit finis litium*, and upon *the necessity*, to carry out this policy, that the future and contingent representatives of the parties in relation to the subject of the judgment should be bound by it. Again, there is no system of jurisprudence, which, founded as the jurisdiction of the court is upon the personal service of the subpœna, is more special in its requisition that all parties interested should be served in the suit, in

order to be bound by the decree, than *that* administered by the English chancery ; yet even in this court, from the same policy, and upon the same necessity, the *first* tenant in tail, or the first person entitled to the inheritance, if there be no tenant in tail living, or even the tenant for life, as the only representative to be found of the whole inheritance, by his appearance to the suit binds to the decree in it all those subsequently and contingently interested in the estate ; the court, in administering this rule of representation of parties, taking care only that the representative be one whose interest in the subject of the suit is such as to insure his giving a fair trial to the question in contestation, the decision of which is to affect those who remotely or contingently take after him. Again, there is the large class of proceedings *in rem*, or *quasi in rem*, known especially to courts administering public or general law, and borrowed from thence into every system of jurisprudence, in which, the jurisdiction being founded upon the possession of the thing, the decree binds all interested in it, whether within or without the jurisdiction of the nation setting up the court, and whether personally or constructively notified of the institution or currency of the proceeding. This, too, is founded upon a necessity or high expediency, since, without it, a prize or instance court, for example, could not, so scattered or concealed are the parties interested, perform any of the functions for which, by the general or public law, it is set up. Proceedings of this nature must, we think, be familiar to the courts of Massachusetts ; and probably not a day passes in which things within their jurisdiction are not, by direct attachment or garnishee process, seized, attached, condemned, and sold under their judgments, without other than constructive notice to the non-resident owners of them, in order that these courts may do justice to their own citizens, or even to alien friends, properly applying to them for relief. Here, too, necessity requires the courts to dispense with personal notice, in order to give effect to their judicial orders ; since otherwise, the state might be full of the property of non-residents and aliens, applicable to all purposes except the commanding ones of justice. Without doubt, in these and other like cases, the general law in dispensing with *personal* notice

from necessity, requires some fair approximation to it, by representation, substitution, or at least such publicity, as under the circumstances, is proper and possible, or the proceeding will be regarded as a fraud upon the rights of the absent and unprotected,—a robbery under the forms of law, and so a fraud upon law itself. It is, however, a very narrow view of *the general law*, it is to form a very low estimate of the wisdom which directs its administration, to suppose, that when it can do justice to those *within* its jurisdiction and entitled. to its aid only by dispensing with personal notice to those *out* of it, and substituting instead what is possible for notice to them, it is powerless to do this, and so, powerless to help its own citizens or strangers within its gates, however strong may be their claims or their necessities. Such a sacrifice of substance to shadows, of the purposes to the forms of justice, might mark the ordinances of a petty municipality, but could hardly be supposed to characterize the system of *general* law.

Now, *marriage*, in the sense in which it is dealt with by a decree of divorce, is not a contract, but one of the domestic *relations*. In strictness though formed by contract, it signifies the *relation* of husband and wife, deriving both its rights and duties from a source higher than any contract of which the parties are capable, and as to these, uncontrollable by any contract which they can make. When formed, this relation is no more a contract than " fatherhood " or " sonship " is a contract. It is no more a contract than serfdom, slavery, or apprenticeship are contracts, the latter of which it resembles in this, that it is formed *by* contract. To this relation there are two parties, as to the others, two or more, interested without doubt in the existence of the relation, and so interested in its dissolution. These parties are placed by the relation in a certain relative state or condition, under the law, as are parents and children, masters and servants ; and as every nation and state has an exclusive sovereignty and jurisdiction within its own territory, so it has exclusively the right to determine the domestic and social condition of the persons domiciled within that territory. It may, except so far as checked by constitution or treaty, create by law new rights in, or impose new duties upon, the parties to these

9 *

relations, or lessen both rights and duties, or abrogate *them*, and so the *legal* obligation of the relation which involves them, altogether. This it may do, with the exception above stated, as to some relations, by *law*, when it wills; declaring that the legal relation, of master and slave, for instance, shall cease to exist within its jurisdiction, or for what causes or breaches of duty in the relation, this, or the legal relation of husband and wife, or of parent and child, may be restricted in their rights and duties or altogether dissolved through the judicial intervention of its courts. The right to govern and control persons and things within the state, supposes the right, in a just and proper manner, to fix or alter the *status* of the one, and to regulate and control the disposition of the other; nor, is this sovereign power over persons and things lawfully domiciled and placed within the jurisdiction of the state diminished by the fact that there are other parties interested through some relation, in the *status* of these persons, or by some claim or right, in those things, who is out of the jurisdiction, and cannot be reached by its process. No one doubts this, as a matter of general law, with regard to the other domestic relations, and what special reason is there to doubt it, as to the relation of husband and wife? The slave who flees from Virginia to Canada—no treaty obliging his restoration—or who is brought by his master thence to a free state of the Union—no constitutional provision enforcing his return—finds his *status* before the law in the new jurisdiction he has entered, changed at once; and no one dreams that this result of a new domicil and the new laws of it, is less legally certain and proper as a matter of general law, because the master is out of the new jurisdiction of his slave, and is not, or cannot be cited to appear and attend to some formal ceremony of emancipation. It is true that slavery is a partial and peculiar institution, not generally recognized by the policy of civilized nations; whereas marriage, in some form, is coextensive with the race, and, as a relation, is nowhere so restrictive and so binding in its obligations as amongst the most truly civilized portions of it. Yet each nation and state has its peculiar law and policy as to the mode of forming, and the mode and causes for judicially dissolving this last relation, according to its right; and

all that other states or nations, under the general law which pervades all Christendom can properly demand is, that in the exercise of its clear right in this last respect as to its own citizens or subjects, it should pay all, and no more attention, than is practicable to the competing rights and interests of *their* citizens and subjects. It should give to non-residents and foreigners, parties to such a relation of general legal sanctity, as to persons of the like description interested in property within its territory, the rights to which are also everywhere recognized, at least such notice by publicity before it proceeds to judicial action, as can, under such circumstances, be given consistently with any judicial action at all, efficient for the purposes of justice. To say that the general law inexorably demands *personal* notice in order to such action, or, still worse, demands that all parties interested in a relation or in property subject to a jurisdiction should be physically within that jurisdiction, is to lay down a rule of law incapable of execution, or to make the execution of laws dependent not upon the claims of justice, but upon the chance locality, or, what is worse, upon the will of those most interested to defeat it.

It is very evident, upon examining the statutes of the different states of the Union, that legislation vesting jurisdiction for divorce in their courts has followed no principle of general law in this respect whatsoever; some statutes making the jurisdiction, or supposing it, to depend upon the place of the *contract*, some upon the place of the *delictum*, and some, as in this state, and as they should do, upon the *domicil* of the wronged and petitioning party. The courts of each state exercise, as they must, jurisdiction upon the principles laid down for them by statute; and have very little occasion, unless called upon to review the decree of some neighboring state, to attend to or consider any *general* principles pertaining to the subject. Engaged in this latter task, they are very apt to confound the *statute* principles of jurisdiction, to which they are accustomed, with the principles of general law relating to it; notwithstanding the latter so obviously grow out of the right of every state to regulate, in some cases by law, and in others by proper judicial action, according to the nature of the subject, the social

condition, or *status*, as it is called, of all persons subject to its jurisdiction. A singular instance of forgetfulness of this principle of "state sovereignty" is afforded by the case of *Hull* v. *Hull*, 2 Strobhart's Equity Appeals, 174; in which the right of the state of Connecticut to dissolve through its courts under the law of that state, a marriage there formed between two of its own citizens, upon the petition of a wife whose husband had deserted her and her children and settled in South Carolina, constructive notice only having been given to the absent and absconding husband, was put upon the ground that dissolution of the *contract* of marriage upon such notice was part of the law of the place of the *contract* and so part of the *contract* itself. The courts of that state, it seems, whilst forgetting the state rights of their northern sister, strenuously insist upon the rights of their own; holding, according to the exploded notion of *Lolley's case*, or rather of *McArthy* v. *McArthy*, that a *South Carolina* marriage cannot be dissolved out of the state of *South Carolina*, although any other may. In *Irby* v. *Wilson*, 1 Dev. & Bat. Eq. R. 568, 576, under similar circumstances, except that in this case the *wife* was the *deserting*, and the *husband* the petitioning party, the supreme court of North Carolina held that a *Tennessee* divorce was *void*, upon the ground hinted at in *Lyon* v. *Lyon*, sup., to wit, that such a proceeding being *between parties*, and the wife having been constructively notified only, although such notice was all that was possible, the courts of Tennessee could not alter by way of redress the *status* of one of its own citizens, become burdensome to him by the alleged causeless and continued desertion of his wife. Upon the same principle, and for the same reason, of course, North Carolina could not relieve from the relation, its citizen, the wife, although her husband might have compelled her to flee from him to the only home open to her in that state, by the grossest violation of the duties which their relation to each other imposed; and thus, *both* these conterminous sovereignties would be powerless for justice, over and upon the call of its respective domiciled inhabitant. In Pennsylvania, the jurisdiction is made to depend upon jurisdiction over the offender *at the time of the offence*, (*Dorsey* v. *Dorsey*, 7 Watts, 349,) as if the *lex loci delicti* were

to govern; in Louisiana, upon like jurisdiction, unless the marriage were contracted within the state, when, we suppose, the *delictum* would be regarded as a *breach of contract*, if such by the law of Louisiana in which the contract was entered into. *Edward* v. *Green*, 9 La. Ann. R. 317. Thus, we perceive, that by some courts marriage is treated as a species of continuing executory contract between the parties, the obligations of which, and the causes and even modes of dissolving which, are fixed by the law of the place of contract. So sacredly local is it, in the view of some, that it cannot be dissolved but by the courts of the country in which it was formed. Others, perceiving, that though a contract, it is one universally recognized, acknowledge the right of foreign tribunals to act upon it, provided that in doing so, they govern themselves not by the only law which they, it may be by *statute*, can administer, but ascertain whether it has been broken, and so ought to be dissolved, by the law of the place of the contract. Some treat breaches of the contract of every degree as *quasi* crimes, to be punished only in the place in which they were committed, provided the parties be then there domiciled; and others, again, qualify this, by an exception in favor of the tribunals of the place of contract; since *there* the *delicta* can be treated as breaches of the contract, if such be the law of the place of contract. If marriage be a contract, or the breach of it a *tort*, it may well be asked, why are they not at least personal in their nature, and transitory in their legal character? passing with the wronged person wherever he or she passes, for redress by any tribunal of the civilized world, which can obtain jurisdiction of the person of the covenant breaker or trespasser?

It is evident that from such confusion of decisions and reasons, no general principle worth considering can, by any process, be eliminated. Raising ourselves above this mist of misapplied learning and ingenuity, and looking at the matter simply as it is, it is obvious, that marriage, as a domestic relation, emerged from the contract which created it, is known and recognized as such throughout the civilized world; that it gives rights, and imposes duties and restrictions upon the parties to it, affecting their social and moral condition, of the measure of which every

civilized state, and certainly every state of this Union, is the sole judge so far as its own citizens or subjects are concerned, and should be so deemed by other civilized, and especially sister, states; that a state cannot be deprived, directly or indirectly, of its sovereign power to regulate the *status* of its *own* domiciled subjects and citizens, by the fact that the subjects and citizens of other states, as related to them, are interested in that *status*, and in such a matter has a right, under the general law, judicially to deal with and modify or dissolve this relation, binding both parties to it by the decree, by virtue of its inherent power over its own citizens and subjects, and to enable it to answer their obligatory demands for justice; and finally, that in the exercise of this judicial power, and in order to the validity of a decree of divorce, whether a *mensa et thoro* or *a vinculo matrimonii*, the general law does not deprive a state of its proper jurisdiction over the condition of its own citizens, because non-residents, foreigners, or domiciled inhabitants of other states have not or will not become, and cannot be made to become, *personally* subject to the jurisdiction of its courts; but upon the most familiar principles, and as illustrated by the most familiar analogies of general law, its courts may and can act conclusively in such a matter upon the rights and interests of such persons, giving to them such notice, actual or constructive, as the nature of the case admits of, and the practice of courts in similar cases sanctions; the purpose of such notice being to banish the idea of secrecy and fraud in the proceeding by inviting publicity to it, as well as to give to persons out of the jurisdiction of the court, every chance possible, under the circumstances, of appearing to the proceeding, and defending, if they will, their own rights and interests involved in it.

These views are supported by the practice of the states of Connecticut and Tennessee called in question, as we have seen, by the courts of South and North Carolina, as probably by the practice of many other states, and certainly by the long continued practice of our own. They are sanctioned by the well-considered decision of *Harding* v. *Alden*, 9 Greenl. R. 140, and by that learned jurisconsult, the late Chancellor Kent, in his note on that case, 2 Kent's Com. 110, n. *b*, 4th ed. They are

otherwise best sustained by authority. *Tolen* v. *Tolen*, 2 Blackf. 407. *Guembell* v. *Guembell*, Wright, 286.. *Cooper* v. *Cooper*, 7 Ohio, 238. *Mansfield* v. *McIntyre*, 10 ib. 27. *Harrison* v. *Harrison*, 19 Alabama, 499. *Hare* v. *Hare*, 10 Texas, 355. See also the whole subject discussed in Bishop on Marriage and Divorce, *passim*, and especially in ch. 34 of that valuable work.

It may be added, that the distressing consequences which otherwise might arise from the conflict of laws and decisions upon this interesting and important subject have been wisely provided against, by a clause of the constitution of the United States, and can find a remedy under it in the supreme court of the United States, as the court of last resort, in cases demanding its application. By art. 4, sect. 1, of the constitution of the United States, "Full faith and credit shall be given in each state to the public acts, records, and judicial proceedings of every other state." As this has been construed by the highest authority to give in every other state the same effect to a judgment or decree of a state court that it has in that in which it is rendered or passed, no serious injury can be done to the proper subjects of our judicial administration by the errors and mistakes of other courts with regard to our jurisdiction. From the nature of the topics constantly agitated before it, no court in the world is better qualified to deal with questions of general law, and especially with one involving, as that before us does, the rights of a state of the union ; and under the trained qualifications of the members of the court, as well as the constitutional power of the court itself, those properly subject to our judgments and decrees in this respect, as in all others, are quite safe, having honestly obtained them, in acting by virtue of them.

Although, as a general doctrine, the domicil of the husband is, by law, that of the wife ; yet when he commits an offence, or is guilty of such dereliction of duty in the relation, as entitles her to have it either partially or totally dissolved, she not only may, but must, to avoid condonation, establish a separate domicil of her own. This she may establish, nay, when deserted or compelled to leave her husband, necessity frequently compels her to establish, in a different judicial or state jurisdiction than

that of her husband, according to the residence of her family or friends. Under such circumstances she gains, and is entitled to gain, for the purposes of jurisdiction, a domicil of her own; and especially, if a native of the state to which she flies for refuge, is, upon familiar principles, readily redintegrated in her old domicil. This is the well-settled doctrine of law upon the subject, (Bishop on Marriage and Divorce, §§ 728–730 incl. and cases cited,) and has by no court been more ably vindicated than by the supreme court of Massachusetts. *Harteau* v. *Harteau*, 14 Pick. 181, 185.

A more proper case for the application in favor of a petitioner for divorce of the foregoing principles relating to the jurisdiction of the court over her case, and to the question of her domicil in this state, can hardly be imagined, than the case at bar. The petitioner is the daughter of a native of this state, who, though formerly resident in Boston, has for many years past been domiciled in his native place, Little Compton. Whilst at school, the petitioner became acquainted with an Englishman of the name of Ditson, and, in 1842, married him, without the knowledge or consent of her parents, in New York. Immediately after marriage the couple went to Europe, and from thence to Cuba, where they lived together several years. Upon their return to this country, she being in a feeble and emaciated condition, he deserted her for the first time in Boston, and was absent in Europe, without leaving any provision for her, for about two years. Upon his return, they appear to have lived together again; he, however, giving every indication of a morose as well as inattentive husband. After a short time, he deserted her again in Boston, declaring, upon his leaving it for Europe that he cared nothing about it, or any person in it, pointing, as the testimony is put to us, to his unfortunate wife. He has been absent from her now between three and four years, without communicating with her, or providing, though of sufficient ability, any thing for her support, nor does she know where he is, except that he has gone to Europe. In the mean time, deserted as she was, she was obliged to return to her father's house in Little Compton; where, during this time, supported by him or by her own exertions, she has resided, with the exception of

about three months passed by her in Newport, Rhode Island. For this desertion and neglect to provide for her, the proof, *ex parte* it is true, but coming from respectable sources, finds no excuse in her conduct, which, according to it, has always, so far as known, been that of a dutiful and faithful wife. We reserved this case, the first on the circuit which presented the question before discussed for consideration, it being admitted that the husband of the petitioner had never resided with her in this state, or even as the proof showed, been within its borders, and was now abroad in parts unknown, and was not, of course, personally served, because under such circumstances he could not be personally served with the ordinary citation issued by us to a resident defendant to such a petition. Under the authorized rule of this court, in regard to constructive notice to an absent defendant to a petition for divorce, upon affidavit of the facts, six weeks' notice of the pendency of this petition was given, by publishing the same for the space of six weeks next before the sitting of the court at this term; and it is evident that the husband of this lady knows, as from his conduct it is apparent that he cares, nothing about this proceeding. Whatever was the former domicil of the petitioner, we are satisfied that she is, and has, for upwards of the last three years, been a domiciled citizen of Rhode Island,—her only home, in the house of her father; and that, as such citizen, and upon such notice, we have power and jurisdiction over her case, and to change her condition from that of a married to that of a single woman, granting to her the relief, which, under like circumstances, the law and policy of Rhode Island accords to all its citizens. Let a decree be entered divorcing Mary Ann Ditson from George L. Ditson, and annulling the bond of matrimony now subsisting between them; and that the name of the said Mary Ann Ditson be changed to, and she be hereafter known and called by the name of Mary Ann Simmons, according to the prayer of her petition.